OTK ASSOCIATES, LLC, directly on its own behalf and derivatively on behalf of Morgans Hotel Group Co., Plaintiff,

v.

Robert FRIEDMAN, Thomas L. Harrison, Michael D. Malone, Michael J. Gross, Ronald W. Burkle, Jeffrey M. Gault, Andrew Sasson, Yucaipa American Alliance Fund II, L.P., Yucaipa American Alliance (Parallel) Fund II, L.P., Yucaipa Aggregator Holdings, LLC, and The Yucaipa Companies LLC, Defendants,

and

Morgans Hotel Group Co., Nominal Defendant.

C.A. No. 8447–VCL.

Court of Chancery of Delaware.

Submitted: Nov. 14, 2013.
Decided: Feb. 5, 2014.

35. *Id.* at 1018–19.

36. *Id.* at 1017.

David J. Margules, Joel Friedlander, Albert J. Carroll, Jaclyn Levy, Bouchard Margules & Friedlander, P.A., Wilmington, Delaware; Peter J. Welsh, Jesse M. Boodoo, Aliza F. Goren, Ropes & Gray LLP, Boston, Massachusetts; Attorneys for Plaintiff.

Kenneth J. Nachbar, Shannon E. German, Morris, Nichols, Arsht & Tunnell LLP, Wilmington, Delaware; Greg A. Danilow, John A. Neuwirth, Stefania D. Venezia, Matthew S. Connors, Weil, Gotshal & Manges LLP, New York, New York; Attorneys for Defendant Robert Friedman.

Edmond D. Johnson, James G. McMillan, III, Pepper Hamilton LLP, Wilmington, Delaware; William A. Brewer III, Catherine Pastrikos, Bickel & Brewer, New York, New York; Attorneys for Defendant Thomas L. Harrison.

Richard D. Heins, Toni–Ann Platia, Ashby & Geddes, P.A., Wilmington, Delaware; Irving M. Brenner, William O.L. Hutchinson, R. Locke Beatty, McGuirewoods LLP, Charlotte, North Carolina; Attorneys for Defendant Michael D. Malone.

Collins J. Seitz, Jr., David E. Ross, Eric D. Selden, Seitz Ross Aronstam & Moritz LLP, Wilmington, Delaware; Attorneys for Defendants Michael J. Gross and Andrew Sasson.

Stephen B. Brauerman, Vanessa R. Tiradentes, Sara E. Bussiere, Bayard, P.A., Wilmington, Delaware; Robert L. Clarkson, Clarkson/Riley, LLP, Los Angeles, California; Attorneys for Defendant Jeffrey M. Gault.

Bruce L. Silverstein, Kathaleen St. J. McCormick, James M. Yoch, Jr., Nicholas J. Rohrer, Paul J. Loughman, Young Conaway Stargatt & Taylor, LLP, Wilmington, Delaware; George M. Garvey, Mark H. Epstein, Munger Tolles & Olson, Los Angeles, California; Attorneys for Defendants Ronald W. Burkle, Yucaipa American Alliance Fund II, L.P., Yucaipa American Alliance (Parallel) Fund II, L.P., Yucaipa Aggregator Holdings, LLC, and The Yucaipa Companies LLC.

Michael A. Pittenger, Timothy R. Dudderar, T. Brad Davey, Matthew F. Davis, Ryan T. Costa, Potter Anderson & Corroon LLP, Wilmington, Delaware; Attorneys for Nominal Defendant Morgans Hotel Group Co.

## OPINION

LASTER, Vice Chancellor.

In March 2013, the board of directors (the "Board") of Morgans Hotel Group Co. ("Morgans" or the "Company") approved a two-part recapitalization involving The Yucaipa Companies, LLC ("Yucaipa"), an entity controlled by prominent investor Ronald W. Burkle. Despite not owning a mathematical majority of the Company's common stock, Yucaipa held a combination of securities and contract rights that, together with Yucaipa's board representation and close relationships with management, gave Yucaipa effective control over Morgans. In the recapitalization, Morgans would transfer to Yucaipa two of its major assets in exchange for the Morgans securities that Yucaipa then held. Meanwhile, Yucaipa would backstop a $100 million rights offering at a substantial premium over the Company's market price. Yucaipa's financial advisor believed that by purchasing rights through the backstop, Yucaipa could acquire approximately 35% of Morgans's common stock and maintain its effective control.

Director Jason Taubman Kalisman, who voted against the recapitalization, and stockholder plaintiff OTK Associates, LLC obtained a preliminary injunction that tem-

porarily blocked the recapitalization. Yucaipa then sent the Company a letter stating "we have no transaction to date" and proposing additional terms. One month later, the Company's stockholders elected a slate of directors nominated by OTK. OTK subsequently filed a Second Verified Amended and Supplemental Complaint (the "Complaint") without Kalisman as a co-plaintiff.

In the Complaint, OTK alleges that Yucaipa, three affiliated entities, Burkle, and the directors who approved the recapitalization breached their fiduciary duties, aided and abetted breaches of fiduciary duties, and engaged in other acts of wrongdoing when pursuing and approving the recapitalization. Counts I–VIII of the Complaint seek to recover from the defendants the damages that the Company suffered, including expenses such as legal and advisory fees and any termination fee that the Company may owe Yucaipa. Count IX of the Complaint seeks a declaration that the agreements governing the recapitalization are invalid.

Yucaipa, its affiliated entities, and five of the individual defendant have moved to dismiss Counts I–VIII as moot. Yucaipa and its affiliated entities have moved to dismiss Count IX in favor of an action they filed in New York and pursuant to Rule 23.1 for lack of pre-suit demand. Two of the defendant directors, Michael D. Malone and Jeffrey M. Gault, have moved for judgment in their favor on the grounds that the Company's certificate of incorporation contains an exculpatory provision authorized by Section 102(b)(7) of the Delaware General Corporation Law (the "DGCL"), 8 *Del. C.* § 102(b)(7), and they only could have breached their duty of care.

Because OTK can recover damages on Morgans's behalf, Counts I–VIII are not moot, and the motion to dismiss on that basis is denied. Count IX is dismissed pursuant to Rule 23.1 to the extent it contends that Yucaipa and its affiliates repudiated the transaction agreements. Otherwise, the motion to dismiss Count IX is denied. Both Malone's and Gault's motions to dismiss in reliance on the exculpatory provision are denied. Given the allegations in the Complaint and the applicable standard of review, which is entire fairness, the court cannot apply the exculpatory provision summarily at the pleadings stage to enter judgment in their favor.

## I. FACTUAL BACKGROUND

The facts are drawn from the Complaint and the documents it incorporates by reference. At this stage of the case, the Complaint's allegations are assumed to be true, and the plaintiff receives the benefit of all reasonable inferences. In short, the facts as recited represent the plaintiff's side of the story. In this case, however, the plaintiff's allegations are quite detailed, because in preparing the Complaint, the plaintiff benefitted from expedited discovery obtained during the injunctive phase of the case. Many of the Complaint's allegations quote from, paraphrase, or refer to deposition testimony or documentary evidence.

### A. Morgans And Yucaipa

Nominal defendant Morgans is a Delaware corporation with its principal place of business in New York, New York. Its common stock trades on the NASDAQ under the symbol "MHGC." Morgans describes itself as a fully integrated lifestyle hospitality company that owns and operates boutique hotels. Its primary assets include the Delano brand, best known for the iconic Delano Hotel located in Miami Beach, Florida, and The Light Group, a food and beverage service that develops,

redevelops, and operates venues primarily in Las Vegas.

Defendant Yucaipa is a Delaware limited liability company headquartered in Los Angeles, California. Defendant Burkle controls Yucaipa. Through two affiliated investment funds (the "Yucaipa Funds"), Yucaipa exercises significant influence over Morgans. For purposes of this motion, Yucaipa is assumed to wield effective control over Morgans.

Yucaipa's control over Morgans stems from a combination of holdings at multiple levels of Morgans's capital structure, a web of contractual rights, board representation, and close relationships with management and certain directors. Yucaipa owns 51% of the Company's senior subordinated notes (the "Notes"), a position with a face value of $88 million. The Notes come due in October 2014. Beginning in July 2014, Yucaipa can convert the Notes into shares of common stock. Yucaipa also owns 100% of the Company's Series A preferred stock (the "Series A Preferred"), whose terms give Yucaipa blocking rights over various transactions, including the ability to veto a sale of all or substantially all of the Company's assets and other transactions where a vote of the Series A Preferred is required by law or the Company's certificate of incorporation. On top of this, Yucaipa owns warrants to purchase 12.5 million shares of the Company's common stock. Pursuant to a securities purchase agreement, Yucaipa has contractual blocking rights that give it the power to veto (i) a sale of substantially all of the Company's assets to a third party, (ii) the acquisition of the Company by a third party, (iii) any acquisition by the Company of a third party that involves an equity investment of $100 million or greater, and (iv) any change in the number of directors to more than nine or less than seven. Yucaipa also has the right to appoint one person to the Board, which Yucaipa has used to make Burkle a director. This right gives Yucaipa access to board-level information about the Company.

## B. Morgans Considers A Possible Restructuring.

In fall 2011, Morgans management began considering how Morgans might restructure Yucaipa's investment. In December 2011, management briefed the Board on a potential transaction, and the Board resolved to form a special committee (the "Special Committee") to consider it.

The directors at the time were Burkle, Kalisman, Malone, Gault, Michael J. Gross, Andrew Sasson, Robert Friedman, Thomas L. Harrison, Edwin L. Knetzger, III, and David T. Hamamoto. Of those, Burkle, Malone, Gault, Gross, Sasson, Friedman, and Harrison are defendants in this action. Knetzger left the Board in May 2012, and Hamamoto resigned in November 2012, before the events giving rise to OTK's claims.

For purposes of a transaction with Yucaipa, Burkle had an obvious conflict of interest. Gross had worked for Yucaipa from 2008 to 2011 sourcing opportunities for various Yucaipa investment funds. He joined the Board in October 2009 as Yucaipa's nominee, and in March 2011, he became the Company's CEO. Gault was described in an email by Yucaipa's financial advisor as "essentially one of [Burkle's] Directors." In January 2012, Gault would become the President and CEO of a Yucaipa portfolio company. Sasson not only had ties to Burkle, but also founded The Light Group, one of the Morgans assets that would be involved in the recapitalization. At the time, Morgans owned 90% of The Light Group and Sasson owned 5%. Company counsel explained in an email that Sasson owed Burkle, because Burkle

had "leaned on Morgans" to buy The Light Group and "bail out Sasson," and it was at "Burkle's insistence" that Sasson was put on the Board. Kalisman, Malone, Friedman, Harrison, Knetzger, and Hamamoto did not have readily identifiable ties to Yucaipa. With the exception of Hamamoto, they became the initial members of the Special Committee.

The resolutions authorizing the Special Committee stated that it was created for the purpose of "considering the Potential Transaction." The resolutions defined the Potential Transaction as "a transaction ... relating to the securities of the Company owned by Yucaipa funds, which are affiliated with Ron Burkle." The resolutions granted the Special Committee "the full power of the Board to evaluate, and to discuss and negotiate, the Potential Transaction with Mr. Burkle and representatives of the Yucaipa funds." The resolutions were silent on the Special Committee's authorization to explore other alternatives or transactions falling outside the definition of a Potential Transaction. The members of the Special Committee believed that their mandate was limited to considering a potential transaction involving Yucaipa such that they had only two options: "figure out a way to do the deal" that Yucaipa wanted, or "say no."

The Special Committee designated Malone to be its lead negotiator. By February 2012, the discussions with Yucaipa had reached an impasse.

## C. The Base Plan

With the Yucaipa transaction on hold, Morgans decided to evaluate its strategic alternatives. The Special Committee continued to meet, and in May 2012, the committee retained Greenhill and Co., Inc. as its financial advisor. The Special Committee asked Greenhill to develop alternatives to de-lever the Company's balance sheet.

In June 2012, Greenhill presented its plan, denominated the "Base Plan." The Special Committee viewed this step as falling within its mandate because the Company needed an alternative to the Yucaipa transaction for the Special Committee to have any leverage in the negotiations with Burkle. Greenhill advised the Special Committee that Morgans only could "get Yucaipa to the table for a reasonable discussion" by showing that the Company had "a standalone Self Help Plan." Greenhill predicted that without an alternative like the Base Plan, Yucaipa would "effectively force an 'out-of-court restructuring' to exert and obtain further control."

Greenhill believed that the Company's near-term cash position should be strengthened through a modest rights offering or a sale of the Delano Hotel. Either option would give the Company financial flexibility, and Greenhill projected that by executing the Base Plan, the Company could be "effectively debt free by the end of 2016" with a stock price of between $15 and $16.75 per share. Greenhill's plan did not depend on a recapitalization involving Yucaipa.

Once Greenhill had finished its preliminary assessment and made its initial recommendations, one of the members of the Special Committee—Harrison—sent Burkle a tip that suggested he had greater loyalty to Burkle than to the Company. In an email sent on June 13, 2012, Harrison provided Burkle with specific details about the Special Committee's discussions and progress with Greenhill. Harrison wrote that he wanted to keep Burkle informed about what the Special Committee and Greenhill were doing.

Shortly after Harrison's tip, Yucaipa took the first of several actions designed to sabotage the Company's standalone, self-help option. By letter dated June 18, 2012, Yucaipa's general counsel objected to

the fact that Morgans had been "talking to a variety of potential investors and investment banks ... concerning a possible recapitalization of the company." The letter warned that "[u]nless such actions cease immediately (without appropriate board review and approval) we will have no option but to seek the intervention of the courts to prevent the unauthorized actions and the resulting damages that are being caused."

Yucaipa's threat arrived just before the full Board met to consider the Base Plan. After hearing from Greenhill and the Special Committee, the Board nevertheless instructed management to begin preparing for both of the alternatives that Greenhill had suggested to strengthen the Company's near-term cash position, first by getting ready for a $50 million rights offering, and second by starting the marketing process for the Delano Hotel. Shortly after the Board meeting, the Company hired Jones Lang LaSalle ("Jones Lang") to market the Delano Hotel.

### D. Burkle Resumes Negotiations While Applying More Pressure.

In response to the Board's preparations to pursue the Base Plan, Burkle came back to the negotiating table and proposed a transaction. On July 2, 2012, during a call with Morgans's President and several Special Committee members, Burkle proposed that Yucaipa acquire the Delano Hotel, The Light Group, and the Delano brand in exchange for Yucaipa's various holdings in Morgans.

Separately, Burkle continued his efforts to sabotage the Base Plan. Some of Morgans's projects at the time included operating a Mondrian Hotel in Moscow, a Delano Hotel in Marrakesh, and a Delano Hotel in Las Vegas. Burkle had close relationships with Morgans's partners in Moscow and with MGM, its partner in the

Las Vegas project. Burkle refused to let Morgans proceed with MGM until Morgans met with him to discuss his proposed transaction. Burkle subsequently told Morgans to "take or leave my deal [and] ..., by the way if you don't, the deals you have in the pipeline (Moscow, MGM ... and Marakesh) are probably going to crater." Around the same time, Sasson terminated The Light Group's involvement with MGM, ostensibly because he felt Morgans was not negotiating with Burkle in good faith.

On July 7, 2012, over the objections of Kalisman, the Special Committee responded to Burkle's July 2 offer and sent a letter outlining the basic terms of a potential transaction. Two days later, Burkle responded with more threats. He told the Special Committee that he was preparing for litigation, but would delay filing as long as he believed that the Special Committee was negotiating in good faith.

At this point, Burkle received another important tip. On July 10, 2012, Morgans's general counsel forwarded Burkle a package of materials prepared by Greenhill for the Special Committee. Burkle promptly forwarded them to his colleagues at Yucaipa and to Yucaipa's financial advisor, Moelis & Company. The Moelis team read the materials, and the Yucaipa team used the information when negotiating with the Special Committee.

More threats from Burkle followed. By letter dated July 21, 2012, Burkle demanded that Morgans make the following disclosure to its potential business partners:

Mr. Burkle is concerned that because of his relationship with your group and his board membership you have not done adequate diligence on the Morgans groups capabilities concerning your project both financially and operationally. We therefore encourage you not to rely on anything but your own diligence.

Ron has various concerns regarding Morgans and is reviewing his relationship with the company and we encourage you to come to your own independent conclusion regarding our project.

Burkle warned that if Morgans did not make the disclosure, he would send it himself. Burkle knew that the disclosure would cause Morgans's business partners to have doubts about the Company and put its business relationships in jeopardy. Burkle gave the Special Committee an explicit ultimatum: "(1) agree to his deal, (2) sell him the Delano and The Light Group and license him the brand (at a higher price), or (3) World War III."

## E. Yucaipa Adds A Proposal To Backstop The Rights Offering.

On August 1, 2012, Yucaipa amended its proposal by offering to backstop a $100 million rights offering at $6 a share, a 26% premium to the Company's then-current stock price of $4.73 per share (the "Rights Offering"). Under Yucaipa's proposal, the Rights Offering would take place in addition to Morgans transferring the Delano Hotel and The Light Group to Yucaipa in return for Yucaipa's pre-Rights Offering securities. This basic transaction structure became the framework for the final recapitalization, which this decision refers to as the "Yucaipa Transaction."

Yucaipa designed the size and price of the Rights Offering to maximize the probability that Yucaipa would gain effective control through the backstop. Moelis, Yucaipa's financial advisor, believed that few stockholders would participate in a premium-priced Rights Offering. Moelis advised Burkle that by backstopping a $100 million rights offering, Yucaipa would emerge with approximately 35% of the common stock, and Burkle would be able to exercise effective control over Morgans. Moelis thought that if the size of the Rights Offering were increased to $160 million, Yucaipa would emerge with a majority of the shares and Burkle would have hard control. Moelis recognized that if a second large stockholder participated in a $100 million rights offering, the other holder would counterbalance Burkle's working control, but that together the two parties would have hard control.

While the Special Committee was considering Burkle's proposal, Gault joined the list of tippers. Gault was not a member of the Special Committee but had inside knowledge about the Special Committee's process. On August 31, 2012, he sent Burkle and Moelis a text that that started with a description of the Special Committee's internal dynamics:

> [M]alone and greenhill are driving process. Malone is pimping for hamamoto. Kalisman is MIA. Harrison and Friedman out of loop. Company is saying it needs to get equity offering done in 45 days. . . . Malone/Greenhills are saying you are delaying process to drive co into weaker position. . . . Co is also saying munger is not responsive-sent management contract two weeks ago and no response.

He then summarized the Special Committee's position:

> Anyhow what I've learned is this: the company has been advised that the Yucaipa/Morgans Hotel deal must be done prior to equity offering. I don't know whether that means signed or closed. To be clear I listened a lot. . . . It looks to me the economics are worked out—this all boils down to governance and controls: back stop terms; board seats; chairman position; ownership rights @ delano; delano exclusive rights radius; and no restrictions on stock purchase.

Gault then provided specific recommendations for taking advantage of the Special Committee:

I'd suggest you get [Yucaipa's counsel at Munger, Tolles & Olson LLP] to send comments/edits before malone meeting so it doesn't become a "red herring" and divert the attention from big issues. I'd be very tough on owner management controls. I can better explain when we talk. . . . Malone knows my views on owner controls.

Gault emphasized that "somehow this transaction has to lead to control (more than 51%) with or without others." He commented that the "board [was] so dysfunctional its a joke," and ended with the following observation: "as long as hamamoto + kalisman represent a 25% voting block its a problem. I'd even go so far as suggest a larger equity offering to achieve further dilution." He promised to get Burkle "the morgans 'burn rate' deck."

This was not the only inside information that Gault sent to Burkle. He also sent other text messages that reported on the Special Committee's activities and gave Burkle advice on how to negotiate against the Special Committee.

Armed with inside information from his tippers, Burkle negotiated with the Special Committee, represented by Malone, over the details of the Yucaipa Transaction. On September 4, 2012, Burkle and Malone agreed that Yucaipa would be allowed to purchase up to 32% of the Company's common stock through the Rights Offering. Two days later, over Kalisman's objection, the Special Committee resolved to recommend that Morgans go forward with Yucaipa's proposal. Malone handed the final negotiations with Yucaipa off to Gross, the Company's CEO, who originally joined the Board as Yucaipa's nominee and worked for Yucaipa from 2008 to 2011.

## F. Burkle Dangles Carrots Before Friedman.

Having already used the stick of threats in the negotiations with the Special Com-

mittee, Burkle added some carrots. One of the members of the Special Committee, Friedman, was a former television and film producer who was searching for job opportunities. Burkle courted him. In September 2012, Burkle entertained Friedman at his $17.5 million triplex penthouse in New York City. Burkle also hosted Friedman at Yucaipa's entertainment networking conference in Montana, where Friedman made several potential business contacts. In a thank you note, Friedman gushed about "the exciting things" Burkle was doing and how the trip "reinforced [his] interest" in Burkle's projects. Friedman admitted in his deposition that he would like to partner with Burkle in the future.

## G. The Special Committee Ignores Alternative Offers.

On October 10, 2012, Hyatt Hotels Corporation sent a letter to Morgans expressing interest in acquiring all of the Company's outstanding shares "at a meaningful premium to recent trading levels." Management routed the Hyatt offer to the full Board, rather than to the Special Committee, and the full Board quickly determined that Hyatt's expression of interest did not provide any basis for discussions.

Meanwhile, Jones Lang had been marketing the Delano Hotel to at least 108 parties and had received a number of bids. Morgans management instructed Jones Lang to push back the bid deadline several times, which OTK believes was designed to preserve Yucaipa's ability to acquire the Delano Hotel. On October 19, 2012, management asked Jones Lang to push back the bid date again. Jones Lang regarded this as precisely the "wrong decision" and contacted Hamamoto. Hamamoto relayed Jones Lang's concerns to Gross and expressed his belief that pushing out the deadline was contrary to the

Board's mandate and appeared designed to help Yucaipa. Hamamoto commented that the Delano Hotel was "the crown jewel" in Morgans's portfolio and should be sold for "the highest price in a competitive process." He felt that to sell it to Yucaipa without knowing how much third parties would bid "makes no sense." The Special Committee's counsel and the Company's outside counsel also expressed concern about delaying the sale process. The lawyers could not understand why Morgans would want to take action that could be seen as cutting off a process designed to determine the highest value available for the Delano Hotel. On October 25, three parties submitted formal bids for the Delano Hotel and two others expressed interest in further discussions. The bids ranged in value from $145 million to $170 million.

On November 26, 2012, Hyatt offered to purchase all outstanding shares of Morgans for $7.50 per share, subject to due diligence, but without any financing contingency. The Special Committee decided that Morgans would not engage in discussions with Hyatt. The $7.50 per share price that Hyatt proposed exceeded by a substantial margin the $6.00 per share price of the Rights Offering. If the offer were disclosed, it would affect the price of the Company's common stock and interfere with Yucaipa's ability to use the Rights Offering as a path to control. Not surprisingly, Yucaipa objected to any public disclosure of Hyatt's bid and threatened Morgans that it would not go forward with the Rights Offering if the offer was disclosed. Company counsel advised that the Hyatt offer was material information that should be disclosed. The Special Committee went against counsel's advice, gave in to Yucaipa, and did not provide any disclosure about the Hyatt bid.

On December 2, 2012, Clipper Equity LLC offered to make a $100 million equity investment in Morgans. Despite the obvious potential for Clipper to serve as an alternative to the Yucaipa backstop or at least as a source of negotiating leverage, the Special Committee did not discuss Clipper's offer, the Board gave it short shrift, and no one reached out to Clipper. Clipper wrote again in late December to reiterate its serious interest in a transaction, including by possibly participating in a rights offering. The Special Committee decided not to respond.

## H. OTK Launches Its Proxy Contest.

On February 28, 2013, the Company issued a press release disclosing that it would hold its annual meeting of stockholders on May 15. The press release stated that the Board had selected March 22 as the record date for determining which stockholders could vote at the annual meeting. On March 15, OTK announced that it intended to nominate a competing slate of directors and make certain business proposals at the annual meeting. OTK owned approximately 13.9% of the Company's outstanding shares of common stock.

Shortly after OTK's announcement, the Company's outside counsel circulated a memorandum outlining a strategy for the incumbent Board to follow in countering the proxy contest. Counsel observed that delaying the annual meeting could give Morgans an opportunity to complete the Yucaipa Transaction and "alter the stockholder base."

## I. Harrison Seeks The Chairman Position.

By early March, Harrison, a member of the Special Committee, had actively begun seeking the position of the Chairman of the Board. Achieving this goal required

the endorsement of the Corporate Governance and Nominating Committee, then chaired by Gault (a Burkle ally), followed by the support of a majority of the Board. Burkle and the three directors who had close ties to him constituted four of the eight directors. If Harrison wanted to become Chairman, he needed Burkle's support. Recall that Harrison tipped Burkle earlier about the Special Committee's work with Greenhill.

## J. The Special Committee Freezes Out Kalisman.

Since November 2012, Morgans management (principally Gross) had taken over the shepherding of the Yucaipa Transaction. By March 2013, the transaction still had not been finalized. On March 19, Kalisman emailed the other members Special Committee and informed them that he did not believe the directors could support the Yucaipa Transaction and comply with their fiduciary duties. Kalisman asked to be informed immediately whether a request for formal approval of the transaction or execution of the definitive documentation was imminent. Harrison asked counsel for advice, and counsel recommended that Kalisman not be given any details about when the transaction would be presented. Kalisman was told that the timing "is not known as of today" and that "both the special committee and the board will receive sufficient advance notice with the necessary materials in advance of any meeting to approve."

During a meeting of the Special Committee held that same day, Kalisman reiterated his concerns about the Yucaipa Transaction and asked for information about its status. Counsel told Kalisman that the transaction was not imminent.

On March 20, 2013, Kalisman emailed the Special Committee to confirm that a deal with Yucaipa was not imminent. He proposed a meeting between OTK's slate and the Special Committee in mid-April. He asked that counsel, one of the Special Committee's chairmen, or management report immediately on any developments with the Yucaipa Transaction. No one suggested that a transaction was imminent or disagreed with Kalisman's request to be kept fully informed.

Unbeknownst to Kalisman, negotiators for Yucaipa and Morgans were already preparing to sign the final transaction documents. The only remaining step was for Deutsche Bank to issue its commitment letter to finance Yucaipa's backstop of the Rights Offering. Two days later, on March 22, 2013, Company counsel advised Yucaipa that the deal documents were in final form. Yucaipa responded that Deutsche Bank's commitment letter was expected on Tuesday, March 26. The Special Committee's counsel already had prepared a reasoned opinion that the Yucaipa Transaction did not require a stockholder vote under Section 271 of the DGCL. No one said anything about any of this to Kalisman, even though he was a director of the Company, a member of the Special Committee, a client of the Special Committee's counsel, and had asked specifically to be kept informed.

On March 24, 2013, Company counsel discussed the timeline for final approval of the Yucaipa Transaction, working backward from an anticipated announcement date of Friday, March 29. Internally, Special Committee counsel lined up resources to prepare for any litigation challenging the deal. No one said anything to Kalisman.

On March 26, 2013, Deutsche Bank signed off on the commitment letter. Counsel discussed whether to let the directors know about the transaction and send out Board materials. Malone decided that no notice would be given or materials

sent until Thursday, March 28, at the earliest. No one updated Kalisman.

On March 27, 2013, the Special Committee's counsel recommended to the other lawyers working on the deal that the Special Committee and the Board hold their meetings to consider the Yucaipa Transaction on Friday, March 29. Malone and the Special Committee's counsel discussed what he should say at the upcoming meetings. No one alerted Kalisman.

### K. Kalisman Learns About The Deutsche Bank Commitment Letter.

During the afternoon of March 27, 2013, Kalisman asked again to be informed about any developments regarding the Yucaipa Transaction. At 8:57 p.m. that evening, the Special Committee's counsel told Kalisman that Deutsche Bank had approved the financing for the Rights Offering—something counsel had learned more than a day earlier. Failing to mention that he already had seen multiple drafts of the commitment letter, the Special Committee's counsel told Kalisman, *his client,* that he had "asked for a copy of the commitment letter when it is issued so we can review it but have been told it has not been provided by DB yet." Counsel also failed to mention that Malone had instructed him to hold back all the documentation and defer noticing Board and Special Committee meetings until after Deutsche Bank provided a signed copy of the commitment letter.

The next day, March 28, 2013, Malone, Greenhill, and the Special Committee's counsel planned for meetings of the Special Committee and the Board to be held over the weekend. No one mentioned this to Kalisman. At 3:39 p.m. on March 28, Kalisman delivered a formal books and records demand in his capacity as a director pursuant to Section 220(d) of the DGCL seeking information about the Yucaipa Transaction. At approximately 6:15 p.m., the Special Committee's counsel told one of his colleagues that it looked like the Board would be meeting on Sunday and the transaction would be announced on Monday. He neglected to provide the same information to Kalisman. By 9:11 p.m., the Special Committee's counsel knew that the meetings would take place on Saturday. He did not tell Kalisman. At approximately 11:13 p.m., the Special Committee's counsel told Malone that the executed commitment letter was in hand and all business and legal issues were resolved. He proposed to notice meetings of the Board and the Special Committee for Saturday afternoon. In the early morning hours of March 29, Malone approved dissemination of notice to the Special Committee and the Board.

### L. Information For The Board And Special Committee Meetings Is Provided.

At approximately 7:20 a.m., Company counsel notified the Board that a special meeting would take place the following day, Saturday, March 30, 2013. The email indicated that the Board would be asked to review, consider, and approve the final documentation for the Yucaipa Transaction. The email attached eleven documents comprising a total of 385 single-spaced pages (the "Transaction Documents"). Many of the Transaction Documents had been in substantially final form since March 20.

Kalisman and the other directors had not previously seen the Transaction Documents. In a follow-up calendar invite sent at 11:45 a.m., Gross indicated that the Board meeting would be held at 4:30 p.m. on Saturday. Historically, the Company had called Board meetings with at least a week's notice to give the directors time to

confirm their availability and review any supporting materials.

At 1 p.m. on March 29, 2013, the Special Committee's counsel informed the members of the committee that they would convene at 2 p.m. on Saturday, March 30. This was the Saturday before Easter and in the middle of Passover. The email attached a fifteen page single-spaced memo from the Special Committee's counsel opining that the Yucaipa Transaction would not require a stockholder vote under Section 271 of the DGCL. The email also included eight single-spaced pages of draft committee resolutions. At 8:16 p.m. on Friday night, Greenhill provided the Special Committee members with a fifty-four page PowerPoint presentation on valuation issues.

After receiving notice of the Board and Special Committee meetings, Kalisman emailed the Special Committee members, objecting that he was not being given reasonable notice or sufficient time to review the voluminous materials. In an email to his colleagues, the Company's general counsel responded dismissively, "As predicted."

## M. The March 30 Meetings

At approximately 2 p.m. on March 30, 2013, the Special Committee convened by telephone. Immediately before the meeting, Kalisman emailed the Board a draft complaint. At the beginning of the teleconference, Kalisman again objected to the inadequate notice and explained that he would participate only because he believed his fiduciary duties required him to do so. He clarified that he did not intend to waive his objection to notice by participating.

When Kalisman questioned the need to move so quickly, the other Special Committee members asserted that Deutsche Bank's commitment letter required the execution of definitive transaction documents within two days. This was technically true, but it was Yucaipa, not Deutsche Bank, who had insisted that the commitment letter expire at 11:59 p.m. on Easter Sunday. Deutsche Bank would have preferred that the commitment letter not expire *until the following week* and was perfectly happy to extend the Company's time to respond to the commitment letter until at least Tuesday. The Company had no pressing financial reason to rush: The Notes would not mature until October 2014.

Rather than discussing the Yucaipa Transaction, the Special Committee members voted to create a subcommittee consisting of everyone but Kalisman (the "Subcommittee"). Then they terminated the teleconference. The Subcommittee convened immediately. Greenhill walked the Subcommittee through its presentation materials and answered questions. At the conclusion of his presentation, Greenhill delivered its opinion that the Yucaipa Transaction was fair to the Company from a financial point of view. The Special Committee's counsel, now apparently acting as counsel to the Subcommittee, delivered his opinion that the Yucaipa Transaction did not require a stockholder vote under Section 271 of the DGCL. The Subcommittee voted unanimously to recommend the Yucaipa Transaction for approval by the Board. The Subcommittee did not discuss, or vote on, a proposal to move the annual meeting date and the record date.

At approximately 4:30 p.m. on March 30, 2013, the full Board convened by telephone. Kalisman again objected to the notice, explained that he would participate only because he believed his fiduciary duties required him to do so, and clarified that he did not intend to waive his objection to the notice by participating. Company counsel walked through the docu-

mentation memorializing the Yucaipa Transaction. Malone spoke briefly about the Special Committee process, and Greenhill reported on the delivery of its fairness opinion to the Special Committee. Outside counsel then presented a proposal to move the annual meeting date and reset the record date. The Board did not receive any advice or information about the likelihood or extent to which current stockholders would participate in the Rights Offering or the effect of moving the annual meeting date and resetting the record date. The Board simultaneously approved the Yucaipa Transaction, postponed the annual meeting from May 15 until July 10, and reset the record date from March 22 to May 29. These changes would allow stockholders who acquired shares in the Rights Offering to vote those shares at the annual meeting.

The Board also approved an amendment to the Company's stockholder rights plan (the "Rights Plan Amendment") that would permit Yucaipa to acquire up to 32% of the Company's outstanding common stock in the Rights Offering without triggering the rights. Critically, the Rights Plan Amendment did not exempt OTK or other stockholders, who would continue to be subject to a 15% threshold. Because OTK already held 13.9% of Morgans's outstanding common stock, OTK would not be able to take full advantage of its oversubscription rights. The Board also exempted Yucaipa, but not OTK or any other stockholders, from Section 203 of the DGCL. These steps addressed Moelis's concern that another large stockholder might offset Yucaipa's ownership and deprive Burkle of effective control. The Yucaipa-specific Rights Plan Amendment and Section 203 exemption ensured that only Yucaipa could use the Rights Offering to increase dramatically its equity stake in the Company.

After the Board and Special Committee meetings, Morgans and Yucaipa executed the Transaction Documents. Under the final terms of the Yucaipa Transaction, Morgans would transfer the Delano Hotel and The Light Group to the Yucaipa Funds in exchange for the Yucaipa Funds' Series A Preferred, warrants, and Notes. In addition, Yucaipa Aggregator Holdings, LLC ("Yucaipa Holdings"), a wholly-owned subsidiary of the Yucaipa Funds, would provide a backstop for the simultaneous $100 million Rights Offering. In the Rights Offering, each record holder of Morgans common stock would be issued a right to purchase shares of common stock for $6.00 per share based on a specified subscription ratio. Yucaipa Holdings would purchase any remaining shares, up to the full $100 million.

The Transaction Documents contemplated that Morgans would pay Yucaipa a $9 million breakup fee if (i) either the Company or Yucaipa terminated the backstop because the Special Committee recommended and the Board approved an alternative transaction or (ii) Yucaipa terminated the transaction because the Board or the Special Committee withdrew or modified, or proposed publicly to withdraw or modify, its approval of the Yucaipa Transaction. The Transaction Documents provided that Morgans would indemnify Yucaipa from and against any and all losses, including reasonable expenses, arising out of any challenge to the Rights Offering or the Yucaipa Transaction generally, up to an aggregate cap of $15 million.

The Transaction Documents recited that the Special Committee had recommended the terms of the Yucaipa Transaction to the Board. Because of the use of the Subcommittee to freeze out Kalisman, that statement was inaccurate. The Special Committee never voted on or recommended the Yucaipa Transaction.

### N. This Litigation

On April 1, 2013, Kalisman filed suit and moved for expedited proceedings, a temporary restraining order ("TRO"), and a preliminary injunction. The next day, the court scheduled a hearing on the TRO application for April 17, the day before the anticipated launch of the Rights Offering. On April 4, the court granted OTK's motion to intervene.

On April 9, 2013, Morgans issued a press release announcing that it had "voluntarily rescheduled the $100 million pro-rata rights offering." The Rights Offering now would close after the record date for the annual meeting. This mooted the plaintiffs' TRO application.

On May 13, 2013, the court heard argument on the plaintiffs' application for a preliminary injunction. On May 14, the court enjoined Morgans from implementing any of the Board resolutions passed on March 30 because of inadequate notice and other process failures (the "Board Process Injunction"). The effect of the Board Process Injunction was to re-establish the *status quo ante* in which the annual meeting would take place on May 15 with a record date of March 22. The court enjoined the Company from rescheduling the annual meeting, but allowed the Company to convene the annual meeting and adjourn it for not more than 30 days to allow the dissemination of supplemental proxy materials.

On May 16, 2013, Yucaipa sent a letter to the Board stating that the "Vice Chancellor has held that we have no transaction to date because of improper notice and other reasons set forth in his opinion." Yucaipa insisted on an additional condition before it would agree to a new Yucaipa transaction:

Yucaipa is willing to do the deal as originally proposed (but not yet approved) with one additional but important condition. The condition to getting this transaction signed and closed is that Yucaipa wants the company to offer to the OTK/Kalisman group the option to join with Yucaipa to provide a portion of full backstop for the Rights Offering, but limit the OTK/Kalisman group to 32% of the company's common stock—this would include the OTK/Kalisman group current ownership interest ... In addition if the company wishes, it can downsize the Rights Offering to $75 million—this is totally your option.

Yucaipa filed its letter publicly with the Securities and Exchange Commission.

On June 14, 2013, Morgans's stockholders elected OTK's entire slate, who opposed the Yucaipa Transaction. On June 27, Yucaipa filed suit in New York against Morgans for breach of the Transaction Documents (the "New York Action"). In that action, Yucaipa seeks monetary damages for the Company's failure to perform under the Transaction Documents, including payment of the $9 million break-up fee. On July 9, OTK filed the Complaint as sole plaintiff. Kalisman is no longer a party to the case.

## II. LEGAL ANALYSIS

Counts I–VIII of the Complaint seek declarations that the Yucaipa Transaction (i) was the product of breaches of fiduciary duties and acts of aiding and abetting such breaches and (ii) violated both the Company's bylaws and the Special Committee's charter. Yucaipa, its affiliates, and Burkle (together, the "Yucaipa Defendants") have moved to dismiss those counts as moot on the grounds that the Yucaipa Transaction was preliminarily enjoined and subsequently abandoned. Count IX of the Complaint seeks a declaration that the Transaction Documents are invalid and unenforceable. The Yucaipa Defendants moved to dismiss or stay Count IX in

favor of the New York Action. They also have moved to dismiss Count IX pursuant to Rule 23.1 for lack of pre-suit demand. Defendants Malone, Gault, and Sasson joined the Yucaipa Defendants in their mootness argument, and Malone and Gault also moved for dismissal based on the exculpatory provision in the Company's charter. Gross moved to dismiss as well, and OTK did not oppose his motion. The court previously dismissed Gross by separate order.

None of the bases for dismissal asserted by the moving defendants takes issue with the legal theories that OTK has asserted. By doing so, the defendants have not conceded that OTK will be entitled to relief on the merits, but for pleading purposes, they have not disputed that the Complaint articulates reasonably conceivable claims. *See Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Hldgs. LLC*, 27 A.3d 531, 536 (Del.2011). For purposes of the motions to dismiss, therefore, this court must assume the following:

- As alleged in Counts I–III and VII, the defendant directors and the Yucaipa Funds breached their fiduciary duties by accelerating the Yucaipa Transaction, delaying the annual meeting, resetting the record date, and approving the Transaction Documents.

- As alleged in Counts IV and VIII, to the extent the Yucaipa Defendants are not deemed to have acted as fiduciaries of Morgans, they aided and abetted others in breaching their fiduciary duties.[1]

- As alleged in Counts V and VI, the defendant directors violated the Company's bylaws and the terms of the board resolutions establishing the Special Committee when they approved the Transaction Documents.

- As alleged in Count IX, the Transaction Documents are not enforceable because (i) the Special Committee never properly resolved to recommend the Yucaipa Transaction and (ii) the Board vote approving the Yucaipa Transaction was invalid.

- As alleged in Count IX, to the extent the Transaction Documents are not otherwise invalid, Yucaipa repudiated them by attempting to impose additional conditions on Yucaipa's performance.

Given these assumptions, the defendants' motions to dismiss Counts I–VIII as moot are denied. Malone's and Gault's motions to dismiss based on Morgans's exculpatory clause are also denied. The motion to dismiss Count IX pursuant to Rule 23.1 is granted in part. The motion to stay Count IX in favor of the forum selection provision is denied.

## A. Mootness

■ The defendants argue that any claims based on the postponement of the annual meeting, the resetting of the record date, and the accelerated approval of the Yucaipa Transaction are moot because (i) the Preliminary Injunction blocked the postponement and re-established the original record date, and (ii) the Yucaipa Transaction will not be consummated. Morgans's potential ability to recover damages

---

1. The Yucaipa Defendants seek dismissal of these counts on the theory that they cannot simultaneously be fiduciaries and aiders and abetters of a fiduciary breach. On the merits, they are correct, but this is a motion to dismiss, and the OTK can plead legal theories in the alternative. *See* Ct. Ch. R. 8(e)(2). The complaint adequately alleges that Burkle controls Yucaipa, which controls the Yucaipa Funds and Yucaipa Holdings. Consequently, for purposes of the motion to dismiss, the Yucaipa Defendants are appropriately treated a single actor that either owed fiduciary duties or, alternatively, aided and abetted the fiduciary breaches of others.

from the defendants means that these claims are not moot.

■ "Mootness arises when controversy between the parties no longer exists such that a court can no longer grant relief in the matter." *Mentor Graphics Corp. v. Shapiro*, 818 A.2d 959, 963 (Del.2003). "A proceeding may become moot in one of two ways: if the legal issue in dispute is no longer amenable to a judicial resolution; or, if a party has been divested of standing." *Gen. Motors Corp. v. New Castle Cty.*, 701 A.2d 819, 823 (Del.1997). "[A] controversy that has become moot normally will be dismissed." *Glazer v. Pasternak*, 693 A.2d 319, 320 (Del.1997). "[I]f the alleged injury still exists despite the occurrence of intervening events, a justiciable controversy remains, and the mootness doctrine will not operate to deprive a court of jurisdiction to hear the case." *NAMA Hldgs., LLC v. Related World Mkt. Ctr., LLC*, 922 A.2d 417, 435 (Del.Ch. 2007).

■ If a challenged transaction goes away, the absence of *transactional* damages arising out of the abandoned deal does not necessarily render the underlying claims moot. When directors have breached their fiduciary duties pursuing the abandoned transaction, "[e]quity may require that the directors of a Delaware corporation reimburse the company for sums spent pursuing such faithless ends." *In re INFOUSA, Inc. S'holder Litig.*, 953 A.2d 963, 996 (Del.Ch.2007). Equity also may look to other consequences of the abandoned transaction, such as any benefit received by the defendant fiduciaries.

> [T]he absence of specific damage to a beneficiary is not the sole test for determining disloyalty by one occupying a fiduciary position. It is an act of disloyalty for a fiduciary to profit personally from the use of information secured in a confidential relationship, even if such

profit or advantage is not gained at the expense of the fiduciary.

*Oberly v. Kirby*, 592 A.2d 445, 463 (Del. 1991).

■ The Delaware Supreme Court's decision in *Thorpe v. CERBCO, Inc.*, 676 A.2d 436 (Del.1996), illustrates both concepts. *CERBCO* involved a derivative action against controlling stockholders who were also directors of the corporation. *Id.* at 437. The stockholder plaintiff alleged that the controlling stockholders had usurped a corporate opportunity by pursuing a potential sale of control of one of CERBCO's subsidiaries without first approaching the corporation. *Id.* The Delaware Supreme Court affirmed the lower court's finding that the controlling stockholders breached their duty of loyalty. *Id.* In determining the appropriate remedy, the Delaware Supreme Court distinguished between damages resulting specifically from the challenged transaction and other damages stemming from a breach of fiduciary duty. *Id.* at 444. Although agreeing that there were no transactional damages, the Supreme Court nonetheless found the controlling stockholders "liable for damages incidental to their breach of duty," which included "the amount of $75,000 [that the controlling stockholders] received from [the third party] in connection with the letter of intent" and "any expenses, including legal and due diligence costs, that the corporation incurred to accommodate the [controlling stockholders'] pursuit of their own interests prior to the deal being abandoned." *Id.* at 445. In justifying this result, the high court explained that "the scope of recovery for a breach of the duty of loyalty is not to be determined narrowly" and that "[t]he strict imposition of penalties under Delaware law [is] designed to discourage disloyalty." *Id.* "Once disloyalty has been established," Delaware law "require[s] that

a fiduciary not profit personally from his conduct, and that the beneficiary not be harmed by such conduct." *Id.*

Counts I–VIII challenge actions taken by the defendant directors and the Yucaipa Defendants in moving the annual meeting, resetting the record date, accelerating the Yucaipa Transaction, and approving the Yucaipa Transaction. As framed, those counts potentially implicate the defendants' duty of loyalty. Under *CERB-CO,* the defendants potentially could be "liable for damages incidental to their breach of duty," such as the fees and expenses that Morgans has incurred in connection with the transaction to date, is continuing to incur, and could be forced to incur if the Yucaipa Defendants are able to recover their $9 million termination fee from Morgans. If found to have breached their duty of loyalty, the Yucaipa Defendants potentially could be required to disgorge the $9 million termination fee, should they recover it. Counts I–VIII are not moot.

## B. The Declaratory Judgment Claim

■ Count IX of the Complaint seeks a declaration that the Transaction Documents are unenforceable against the Yucaipa Defendants. The Yucaipa Defendants have moved to dismiss this count pursuant to Rule 23.1 because it is a derivative claim for which pre-suit demand is not excused. They also have moved to dismiss or stay Count IX in light of a forum selection clause in the Transaction Documents.

### 1. Rule 23.1

The claim that the Transaction Documents are invalid belongs to Morgans, the party to those agreements. The remedy of declaring the Transaction Documents invalid would flow to and benefit Morgans. Count IX is therefore derivative and sub-ject to Rule 23.1. *See Tooley v. Donaldson, Lufkin & Jenrette, Inc.,* 845 A.2d 1031, 1033 (Del.2004). The outcome of the defendants' motion to dismiss pursuant to Rule 23.1 turns on which board is the operative board for purposes of demand futility. If it is the board in office when OTK originally filed its complaint, then demand is futile. If it is the current board, then demand is not futile.

■ "[W]hen an amended derivative complaint is filed, the existence of a new independent board of directors is relevant to a Rule 23.1 demand inquiry only as to derivative claims in the amended complaint that are not already validly in litigation." *Braddock v. Zimmerman,* 906 A.2d 776, 786 (Del.2006) (footnote omitted). Under *Braddock,* there are three elements that excuse a derivative plaintiff from making demand on the board in place at the time an amended complaint is filed: "first, the original complaint was well pleaded as a derivative action; second, the original complaint satisfied the legal test for demand excusal; and third, the act or transaction complained of in the amendment is essentially the same as the act or transaction challenged in the original complaint." *Id.* (footnote omitted).

■ The third element of the *Braddock* test captures the requirement that the claim have been "already validly in litigation." This element is satisfied even when new legal theories of recovery are asserted in an amended complaint, so long as they are based on the same acts and transactions complained about in the original complaint.

[A]n amendment or supplement to a complaint that elaborates upon facts relating to acts or transactions alleged in the original pleading, or asserts new legal theories of recovery based upon the acts or transactions that formed the sub-

stance of the original pleading, would not, in my opinion, constitute a matter that would require a derivative plaintiff to bring any part of an amended or supplemental complaint to the board prior to filing.

*Harris v. Carter,* 582 A.2d 222, 231 (Del. Ch.1990) (Allen, C.).

In *Harris,* the original and amended complaints both alleged that: (i) Atlas, the corporation on whose behalf the suit was brought, purchased shares of another corporation stock at a price unfair to Atlas; (ii) "the sale by the Carter defendants of their controlling Atlas shares to [defendant] Mascolo constituted a breach of an alleged duty of care to Atlas' minority stockholders"; (iii) "following Mascolo's acquisition of control of Atlas, he caused the company to enter into a merger transaction with a corporation owned by the Mascolo [defendants] at a price unfair to Atlas and its stockholders," and (iv) "[o]ne alleged foreseeable effect of the merger was an increase in the percentage ownership of Atlas by the Mascolo [defendants] and a corresponding decrease in the percentage of Atlas' equity represented by all other shares." *Id.* at 231 n. 14. The amended complaint "[n]ewly presented ... the theory that the payment by Atlas of an alleged finder's fee for locating a buyer for the Carter [defendants'] Atlas stock constituted a corporate waste in which both groups of defendants participated." *Id.* The Court of Chancery found that this newly presented "matter [was] sufficiently bound up with the facts originally alleged to constitute a part of the original claim." *Id.*

The declaratory judgment claim, Count IX, seeks to have the court declare the Transaction Documents unenforceable on two alternative grounds: (i) the Transaction Documents are not enforceable as a result of fiduciary breaches in the approval of the Yucaipa Transaction, or (ii) to the extent the court determines that the Transaction Documents were binding, Yucaipa repudiated them when it attempted to impose an additional and material condition on Yucaipa's willingness to perform.

The first ground seeks a declaration of invalidity because of the alleged fiduciary duty breaches, and it flows from the allegations and claims asserted in the other counts. In essence, it repackages the counts of the original complaint as a request for a declaratory judgment invalidating the Transaction Documents. Like the amended complaint in *Harris,* which asserted a new legal theory of recovery, the declaratory judgment claim seeking to have the Transaction Documents declared unenforceable as a result of fiduciary breaches is "sufficiently bound up with the facts originally alleged to constitute a part of the original claim." *Id.* The claims in the original complaint were pleaded as either direct or both direct and derivative. The defendants' motion to dismiss the portion of Count IX seeking a declaratory judgment on the first ground is denied to the extent that it seeks a declaration of unenforceability because of the alleged breaches of fiduciary duty.

In contrast, the second ground is based on facts occurring after the first complaint was filed. Unlike the first ground, the repudiation allegations in Count IX were not already validly in litigation. The repudiation allegations are exclusively derivative, and demand was not made on the new board. Under *Rales,* "a court must determine whether or not the particularized factual allegations of a derivative stockholder complaint create a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand." *Rales v. Blasband,* 634 A.2d 927, 934 (Del.1993).

The factual allegations of the amended complaint do not create reasonable doubt that the newly elected board of directors could have properly exercised its independent and disinterested business judgment. The defendants' motion to dismiss the portion of Count IX seeking a declaratory judgment on repudiation grounds is granted.

## 2. The Forum Selection Clause

One of the Transaction Documents is an exchange agreement between Morgans and the Yucaipa Funds and Yucaipa Holdings dated March 30, 2013 (the "Exchange Agreement"). Section 10.10 of the Exchange Agreement selects the laws of the State of New York to govern the agreement. Section 10.9 of the Exchange Agreement selects any state or federal court sitting in the Borough of Manhattan of The City of New York as the exclusive forum for disputes arising out of or relating to the Transaction Documents, except for two sections of the Exchange Agreement that no one has argued apply in this case:

> All actions and proceedings arising out of or relating to this Agreement and the Other Agreements shall be heard and determined exclusively in any New York state or federal court sitting in the Borough of Manhattan of The City of New York, . . . . The parties hereto hereby (a) submit to the exclusive jurisdiction of any state or federal court sitting in the Borough of Manhattan of The City of New York for the purpose of any Action arising out of or relating to this Agreement or the Other Agreements brought by any party hereto, . . . and (b) irrevocably waive [forum-related defenses.]

Exchange Agreement § 10.9.

■■■■ "When a contract contains a forum selection clause, [Delaware courts] will interpret the forum selection clause in accordance with the law chosen to govern the contract." *Ashall Homes Ltd. v. ROK Entm't Gp. Inc.*, 992 A.2d 1239, 1245 (Del. Ch.2010). Under New York law, forum selection clauses are presumptively valid. *See, e.g., Brooke Gp. Ltd. v. JCH Syndicate 488*, 87 N.Y.2d 530, 640 N.Y.S.2d 479, 663 N.E.2d 635, 637 (1996) (recognizing "that parties to a contract may freely select a forum which will resolve any disputes over the interpretation or performance of the contract" and that "[s]uch clauses are *prima facie* valid and enforceable unless shown by the resisting party to be unreasonable"); *Sterling Nat'l Bank v. E. Shipping Worldwide, Inc.*, 35 A.D.3d 222, 826 N.Y.S.2d 235, 237 (2006) (same). Delaware law is to the same effect. *See Ingres Corp. v. CA, Inc.*, 8 A.3d 1143, 1146 (Del.2010) (holding that forum selection clauses are "presumptively valid and should be specifically enforced unless the resisting party clearly shows that enforcement would be unreasonable and unjust, or that the clause is invalid for such reasons as fraud and overreaching") (internal quotation marks and footnote omitted); *see also Nat'l Indus. Gp. (Hldg.) v. Carlyle Inv. Mgmt. L.L.C.*, 67 A.3d 373, 381 (Del. 2013) ("A valid forum selection clause must be enforced." (footnote omitted)).

■■■■ As noted in the previous section, Count IX lumps two theories together in a single count. One theory—repudiation—has been dismissed under Rule 23.1 The remaining theory is that the Transaction Documents are invalid because of breaches of fiduciary duty and acts of aiding and abetting committed by the defendant directors and the Yucaipa Defendants. Under the internal affairs doctrine, that issue is governed by Delaware law, not by the terms of the Transaction Documents. *VantagePoint Venture P'rs 1996 v. Examen, Inc.*, 871 A.2d 1108, 1113 (Del.2005). The outcome will turn on the relationships

between Morgans and its stockholders, on the one hand, and their fiduciaries and the alleged aiders and abetters, on the other. The language of the Transaction Documents may well be considered as a factual input in the analysis, but the governing legal doctrine will be Delaware common law, not New York contract law or related aspects of New York business tort and commercial law that apply to third party, arms' length relationships.

One possible consequence of an adjudicated breach of the duty of loyalty under Delaware law might be to rescind the Transaction Documents, but the basis for rescission would be the Delaware law of fiduciary duties. A necessary predicate for such a remedy, or any other remedy that Delaware fiduciary duty law would impose on the Yucaipa Defendants, is either fiduciary status or culpability in a fiduciary breach as an aider and abetter. If the Yucaipa Defendants establish that they acted solely as third parties and were neither fiduciaries nor aiders and abetters, then Delaware's internal law of corporate governance would have no claim on them, and the Transaction Documents could not be enjoined or invalidated on a fiduciary theory.[2] Under those circumstances, the Yucaipa Defendants would be analogous to *bona fide* third party purchasers and entitled to insist on their contract rights. Such a finding would not preclude a remedy against the fiduciaries who granted the binding third party contract rights in breach of their duties.

The Delaware Supreme Court's decision in *Parfi Holding AB v. Mirror Image Internet, Inc.*, 817 A.2d 149 (Del.2002), speaks to whether a forum selection provision in a third party agreement extends to Delaware law claims for breach of fiduciary duty. The *Parfi* decision considered an arbitration clause, which the Delaware Supreme Court has recognized as "a specialized kind of forum-selection clause." *Carlyle*, 67 A.3d at 384 n. 41.

In *Parfi*, the Delaware Supreme Court held that the arbitration clause at issue would not be enforced to cover a claim that did not "touch on contract rights or con-

---

**2.** *Compare In re Del Monte Foods Co. S'holders Litig.*, 25 A.3d 813, 836–37, 840–42 (Del. Ch.2011) (granting preliminary injunction against exercise of contract rights where there was a reasonable probability that third party acquirer had aided and abetted the fiduciary breach), *with In re El Paso Corp. S'holder Litig.*, 41 A.3d 432, 448–49 (Del.Ch.2012) (declining to issue preliminary injunction against exercise of contract rights where third party acquirer had bargained at arms' length and there was not a reasonable probability of success on a claim of aiding and abetting), *and In re Toys "R" Us, Inc. S'holder Litig*, 877 A.2d 975, 1022–23 (Del.Ch.2005) (declining to issue preliminary injunction where bidder negotiated for reasonable contract provisions). The decisions in which the Delaware Supreme Court has issued or affirmed the issuance of injunctions targeted to specific deal protection terms all involved viable claims of aiding and abetting against the holder of the third party contract rights. *See, e.g., Paramount Commc'ns Inc. v. QVC Network Inc.*, 637 A.2d 34, 51 (Del.1994) (affirming targeted injunction against stock option lockup and expanding it to include no-shop and termination fee where counterparty, "a sophisticated party with experienced legal and financial advisors, knew of (and in fact demanded) the unreasonable features"); *Mills Acq. Co. v. Macmillan, Inc.*, 559 A.2d 1261, 1288 (Del. 1989) (reversing denial of injunction by Court of Chancery, granting of targeted injunction against asset lock-up and breakup fee and expense reimbursement provisions where bidder knowingly participated in breach by receiving and using information gained from improper management tip during sale process); *Revlon, Inc. v. MacAndrews & Forbes Hldgs., Inc.*, 506 A.2d 173, 183–85 (Del.1986) (affirming targeted injunction against asset lock-up and termination fee where counterparty consistently received favored treatment to the exclusion of other bidders and used advantage to demand unreasonable defensive measures).

tract performance" under the agreement containing the clause. *Parfi*, 817 A.2d at 155. The Delaware Supreme Court also held that this court erred by sending breach of fiduciary duty claims to arbitration when the arbitration provision appeared in an underwriting agreement that neither gave rise to nor governed the defendants' status as fiduciaries. *Id.* at 156–57. The arbitration provision embraced "any dispute, controversy or claim arising out of or in connection with" the underwriting agreement. *Id.* at 151 (internal quotation marks omitted). This court had held that the clause applied to both breach of fiduciary duty claims and contract claims because they arose out of a common set of underlying facts. The Supreme Court agreed that the claims arose "from some or all of the same facts," but held that the clause did not apply because the defendant's "fiduciary duties to [plaintiff] consist of a set of rights and obligations that are independent of any contract." *Id.* at 157 (footnote omitted); *accord Reznik v. Silverstein, Gitlin Dental Office, P.C.*, 2009 WL 889958 (N.Y.Sup.Ct. Mar. 17, 2009). This situation contrasts with an arbitration provision or other forum selection clause that appears in the document that gives rise to the fiduciary relationship, which will govern fiduciary duty claims. *See Elf Atochem N. Am., Inc. v. Jaffari*, 727 A.2d 286, 294–95 (Del.1999) (requiring arbitration of claims for breach of fiduciary duty by manager when LLC agreement giving rise to manager's status and duties contained mandatory arbitration clause).

OTK's claims for breach of fiduciary duty parallel those of the plaintiffs in *Parfi*, and the same result should apply. OTK's claims also bear a strong resemblance to the theories regularly advanced by plaintiffs who own stock in the sell-side company and who bring lawsuits against the sell-side fiduciaries and the acquirer (setting aside the claims for breach of the duty of disclosure that the plaintiffs routinely advance). Stockholder lawsuits challenging mergers and acquisitions regularly contend that the sell-side fiduciaries breached their fiduciary duties of care and loyalty by approving the transaction and that the acquirer aided and abetted the alleged fiduciary wrongdoing. The plaintiffs typically seek an injunction against the closing of the merger and rescission or damages if the merger should close.

As OTK observes, it has not traditionally been thought that a contractual forum selection provision in the transaction agreement governed the stockholder plaintiffs' claims for breach of fiduciary duty and aiding and abetting. If Yucaipa is correct, then the solution to the problem of multi-forum litigation has been hiding in plain sight for decades, under the noses of the courts and corporate bar.

There are obvious advantages to Yucaipa's approach, but it would represent a substantial shift in the status quo. In light of *Parfi* and how courts have long handled M & A litigation, a change of that magnitude would have to come from the Delaware Supreme Court. The contractual forum selection clause in the Exchange Agreement does not govern Count IX to the extent relief is based on OTK's corporate governance claims.

### 3. Whether The Declaratory Judgment Claim Adequately States A Claim

 The defendants argue that the plaintiff seeks the declaratory judgment in Count IX for an improper purpose: to preempt Yucaipa's New York contract suit and obtain advantages that the plaintiff perceives to be available to it in Delaware, rather than for a valid remedial purpose. As a result, the defendants argue, the

plaintiff fails to state a claim for declaratory relief.

■ Under the Delaware Declaratory Judgment Act, 10 *Del. C.* § 6501, et seq., declaratory relief may be sought for the purpose of "settl[ing] and ... afford[ing] relief from uncertainty and insecurity with respect to rights, status and other legal relations." 10 *Del. C.* § 6512. "The purpose of a declaratory judgment is to provide a technique for early resolution of disputes, not to shift the forum for a protracted trial." *United Eng'g & Constructors, Inc. v. Imo Indus., Inc.,* 1993 WL 43016, at *4 (Del.Ch. Feb. 16, 1993) (citing *Stroud v. Milliken Enters., Inc.,* 552 A.2d 476, 481 (Del.1989)).

As discussed above, the aspect of Count IX that has not been dismissed seeks a declaratory judgment that the Transaction Documents are unenforceable as a result of fiduciary duty breaches, aiding and abetting of those breaches, and violations of Morgans's bylaws and the Special Committee's charter. This aspect of Count IX is based on the same acts and transactions raised in the original complaint, which OTK has articulated in greater detail in Counts I–VIII. Based on the facts asserted in the Complaint, and all reasonable inferences drawn from those facts, Count IX is not being brought for any improper purpose. Rather, it states a valid claim for declaratory relief.

### 4. Whether The Declaratory Judgment Claim Should Be Stayed

■ Last, the defendants argue that Count IX should be stayed pending resolution of the New York Action. Under the *McWane* doctrine, Delaware courts should exercise their discretion to stay litigation when "there is a prior action pending elsewhere, in a court capable of doing prompt and complete justice, involving the same parties and the same issues."

*McWane Cast Iron Pipe Corp. v. McDowell–Wellman Eng'g Co.,* 263 A.2d 281, 283 (Del.1970).

The New York Action and this Delaware litigation have some overlapping parties, namely Yucaipa and Morgans. However, the role of Yucaipa differs in the two actions: the New York Action focuses on the rights and obligations set forth in the Transaction Documents. The Delaware litigation focuses on the rights and liabilities as between Yucaipa, as an *alleged fiduciary* or as an *aider and abetter of a fiduciary breach,* and Morgans. These are different theories and involve different issues.

Under the first *McWane* factor, the relevant portion of Count IX relates back to the filing of the original complaint. The New York Action is not a prior pending action, and *McWane* does not apply.

■ When a Delaware action is the first-filed action, Delaware "courts will uphold a plaintiff's choice of forum except in the rare case where that choice imposes overwhelming hardship on the defendant." *United Phosphorus, Ltd. v. Micro–Flo,* 808 A.2d 761, 764 (Del.2002); *accord Mar-Land Indus. Contractors, Inc. v. Caribbean Petroleum Ref., L.P.,* 777 A.2d 774, 778 (Del.2001). Delaware "courts consider the so-called *Cryo–Maid* factors" when determining "whether a defendant has met this heavy burden of establishing overwhelming hardship." *United Phosphorus,* 808 A.2d at 764. The *Cryo–Maid* factors direct the court to consider (i) "the relative ease of access to proof," (ii) "the availability of compulsory process for witnesses," (iii) "the possibility of a view of the premises," (iv) "whether the controversy is dependent upon the application of Delaware law which Delaware courts more properly should decide than those of another jurisdiction," (v) "the pendency or nonpendency of a similar action or actions in another

jurisdiction," and (vi) "all other practical problems that would make the trial of the case easy, expeditious and inexpensive." *Id.* (footnote omitted).

The Yucaipa Defendants have not sought to show that litigating in Delaware imposes overwhelming hardship. Further, the relevant portion of Count IX depends on the application of Delaware law, which counsels against staying Count IX. Count IX is not stayed pending resolution of the New York Action.

## C. Section 102(b)(7)

■■■■■ Malone and Gault have moved to dismiss the Complaint on the grounds that it at most states a claim for breach of the duty of care, for which they would be exculpated under Article Tenth of Morgans's Certificate of Incorporation (the "Exculpatory Clause"). The Exculpatory Clause states:

> A director of the corporation shall not be liable to the corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, except to the extent that such exemption from liability or limitation thereof is not permitted under the Delaware General Corporation Law as currently in effect or as the same may hereafter be amended.

The exemptions from liability that are not permitted by the DGCL are (i) any breach of the director's duty of loyalty; (ii) an act or omission not in good faith or involving intentional misconduct or a knowing violation of law; (iii) an unlawful dividend or stock repurchase under Section 174; and (iv) any transaction from which the director derived an improper personal bene-

fit. 8 *Del. C.* § 102(b)(7). In short, a Section 102(b)(7) provision "can exculpate directors from monetary liability for a breach of the duty of care, but not for conduct that is not in good faith or a breach of the duty of loyalty." *Stone ex rel. AmSouth Bancorporation v. Ritter,* 911 A.2d 362, 367 (Del.2006) (footnote omitted). "A failure to act in good faith may be shown, for instance, where the fiduciary intentionally acts with a purpose other than that of advancing the best interests of the corporation." *See In re Walt Disney Co. Deriv. Litig.,* 906 A.2d 27, 67 (Del.2006); *accord Stone,* 911 A.2d at 369 ("A failure to act in good faith may be shown, for instance, where the fiduciary intentionally acts with a purpose other than that of advancing the best interests of the corporation...."). Bad faith encompasses both "intent to harm [and] also intentional dereliction of duty." *Lyondell Chem. Co. v. Ryan,* 970 A.2d 235, 240 (Del.2009).

■■■■■ "[T]he shield from liability provided by a certificate of incorporation provision adopted pursuant to 8 *Del. C.* § 102(b)(7) is in the nature of an affirmative defense." *Emerald P'rs v. Berlin (Emerald I),* 726 A.2d 1215, 1223 (Del. 1999) (footnote omitted). "Defendants seeking exculpation under such a provision will normally bear the burden of establishing each of its elements." *Id.* at 1223–24. The degree to which a court can classify claims as falling only within the duty of care and enter judgment based on the statutory immunity conferred by Section 102(b)(7) depends on the stage of the case, the standard of review, and the allegations or evidence to be considered at that procedural stage.[3] In a breach of fiduciary duty

---

**3.** *Compare Emerald I,* 726 A.2d at 1223 (holding that in challenge to transaction with majority stockholder to which entire fairness applied, court could not apply Section 102(b)(7)

on motion for summary judgment because factual conflicts required a trial to determine nature of the duty breached), *with Malpiede v. Townson,* 780 A.2d 1075, 1094–96 (Del.2001)

case, at the pleadings stage, when the business judgment rule provides the operative standard of review, a court can apply a Section 102(b)(7) provision summarily to enter judgment in favor of defendant directors unless the complaint pleads sufficient facts to rebut the business judgment rule and call into question the existence of a disinterested and independent board majority that acted in good faith. *See Malpiede*, 780 A.2d at 1094–96.

■ In this case, the plaintiff has pled facts sufficient to call into question the disinterestedness and independence of enough members of the Board and of the Special Committee such that neither could muster a disinterested and independent majority. None of the defendants other than Malone have challenged those allegations for purposes of the motion to dismiss. The Complaint's allegations rebut the presumptions of the business judgment rule at the pleadings stage, making entire fairness the operative standard of review.

■ Entire fairness likewise is the proper standard of review because, for purposes of the motion to dismiss, Yucaipa is deemed to control Morgans. If a challenged transaction would confer a unique benefit on a party exercising *de facto* control, then entire fairness is the standard of review. *See Kahn v. Tremont Corp.*, 694 A.2d 422, 428 (Del.1997) ("Regardless of where the burden lies, when a controlling shareholder stands on both sides of the transaction the conduct of the parties will be viewed under the more exacting standard of entire fairness...."); *Kahn v.*

(holding that in challenge to third-party, arms' length merger that was approved by fully informed stockholder vote, court could apply Section 102(b)(7) at pleadings stage unless plaintiff pled facts sufficient to show that a majority of the board was not disinterested or independent), *with Emerald P'rs v. Berlin (Emerald II)*, 787 A.2d 85, 93–94 (Del.2001) (holding that in challenge to transaction with

*Lynch Commc'n Sys., Inc.*, 638 A.2d 1110, 1115 (Del.1994) ("A controlling or dominating shareholder standing on both sides of a transaction ... bears the burden of proving its entire fairness.").

Specifically with respect to Malone, a member of the Special Committee, the Complaint alleges that he abdicated his lead negotiator role in favor of Gross, whom he knew was not independent of Yucaipa because of his status as the Company's CEO and in light of his prior associations with Yucaipa. Malone is alleged to have actively misled a fellow director, Kalisman, as to the imminence of the Yucaipa Transaction. Malone also was instrumental in delaying the notice of the Board and Special Committee meetings on March 30, 2013. On Tuesday, March 26, he told the Special Committee's counsel "not [to] schedule [the meetings] until all legal and business issues [were] done. No earlier than Thursday [ ] pm I would think." He also instructed the Special Committee's counsel "to hold back all the documentation and defer noticing Board and [Special Committee] meetings until receipt of the signed [commitment letter]."

■ Viewed in the context of the Complaint as a whole, these allegations are sufficient to support a pleadings stage inference that Malone was acting for some reason other than the best interests of Morgans and its stockholders. The pleading requirements to survive a Rule 12(b)(6) motion in Delaware state court "are minimal." *Cent. Mortg.*, 27 A.3d at 536.

majority stockholder to which entire fairness applied, court could not apply Section 102(b)(7) without first analyzing transaction under entire fairness standard to determine nature of the fiduciary breach). *See generally* 1 David A. Drexler et al., III, *Delaware Corporation Law and Practice*, § 6.02[7] at 6–21 (2012).

When considering a defendant's motion to dismiss, a trial court should accept all well-pleaded factual allegations in the Complaint as true, accept even vague allegations in the Complaint as "well-pleaded" if they provide the defendant notice of the claim, draw all reasonable inferences in favor of the plaintiff, and deny the motion unless the plaintiff could not recover under any reasonably conceivable set of circumstances susceptible of proof.

*Id.* (footnote omitted). This standard asks whether there is a "possibility" of recovery. *Id.* at 537 n. 13. Based on the allegations of the Complaint and with entire fairness as the standard of review, there is a "possibility" that Malone could be found to have breached his duty of loyalty. The pleadings stage test standard is lower than the merits-focused element of the preliminary injunction standard, which requires that the plaintiff show a reasonable probability of success on the merits. This court's prior comment during its ruling on an application for preliminary injunction that the plaintiffs had not shown a reasonable probability of success on the merits of establishing a breach of the duty of loyalty by Malone does not dictate the outcome of a pleadings-stage motion.

In light of the Complaint read as a whole, the specific allegations against Malone, and the anticipated standard of review, it is not possible to hold as a matter of law that "the factual basis for [the plaintiff's claims] *solely* implicates a violation of the duty of care." *Emerald I,* 726 A.2d at 1224. The court therefore cannot apply the Exculpatory Clause summarily at the pleadings stage to dismiss the claims against Malone.

Gault did not challenge the allegations against himself in his motion to dismiss. He joined in Malone's opening brief, then attempted to make his own arguments for the first time on reply. The court granted the plaintiff's motion to strike his reply brief. Because Gault did not articulate why the Section 102(b)(7) provision bars any recovery against him, his motion is likewise denied. Regardless, as recited in the Factual Background, the Complaint adequately alleges that Gault has close ties to Yucaipa and that he tipped Burkle about the Special Committee's negotiating posture. The allegations are sufficient at the pleading stage to support an inference that Gault breached his duty of loyalty.

## III. CONCLUSION

The motion to dismiss Counts I–VIII as moot is denied. To the extent that Count IX seeks a declaration of the unenforceability of the Transaction Documents because of the alleged breaches of fiduciary duty, the motion to dismiss Count IX is denied. The motion to dismiss Count IX is otherwise granted. The motions to dismiss based on the Exculpatory Clause are denied.