# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| AMGINE TECHNOLOGIES (US), INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **C.A. No. 2020-0537-JRS** |
| | ) | |
| HAROLD ROY MILLER, JONATHAN | ) | |
| DAVID MEYER MILLER, SEVEN | ) | |
| MEDICAL INC., AMGINE | ) | |
| TECHNOLOGIES US HOLDING, LLC, | ) | |
| and AMGINE HOLDINGS LTD., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Date Submitted:  August 17, 2021
Date Decided:  November 29, 2021

Emily V. Burton, Esquire and Alberto E. Chávez, Esquire of Young Conaway Stargatt & Taylor, LLP, Wilmington, Delaware, Attorneys for Plaintiff.

Srinivas M. Raju, Esquire and Angela Lam, Esquire of Richards, Layton & Finger, P.A., Wilmington, Delaware; Michael C. Holmes, Esquire, Margaret Dunlay Terwey, Esquire and Meredith S. Jeanes, Esquire of Vinson & Elkins LLP, Dallas, Texas; and Christopher E. Duffy, Esquire, David A. Hoffman, Esquire and W. Logan Lewis, Esquire of Vinson & Elkins LLP, New York, New York, Attorneys for Defendants.

**SLIGHTS, Vice Chancellor**

In this action, Plaintiff, Amgine Technologies (US), Inc. ("Amgine US" or "Plaintiff"), challenges two purported instances of misconduct by Amgine US's former controlling stockholders—father and son Harold Roy Miller ("Roy") and Jonathan David Meyer Miller ("Jonathan").[1]  First, Plaintiff alleges that the Millers wrongfully caused the assignment of intellectual property developed and funded by Amgine US to Seven Medical, Inc. ("Seven Medical"), an entity partially owned and controlled by the Millers.  Second, Plaintiff alleges that the Millers executed a self-dealing scheme by orchestrating the 2017 reorganization of Plaintiff's sister-company, Amgine Technologies Limited ("Amgine Canada"), on terms favorable to the Millers and detrimental to Plaintiff and its stockholders (the "Inversion").  As part of the Inversion, Plaintiff, Amgine Canada, and Amgine Canada's stockholders entered into a unanimous stockholders agreement dated January 10, 2017 (the "CSA"), which facilitated Plaintiff's now-challenged acquisition of Amgine

---

[1] Roy and Jonathan are collectively referred to as the "Millers."  I refer to both by their first names for clarity and intend no familiarity or disrespect.  Defendants, Seven Medical, Amgine Technologies US Holding, LLC ("US Holding") and Amgine Holdings Ltd. ("Canada Holdings"), are collectively referred to as the "Miller Entities."

Canada.[2]  The CSA is at the heart of this dispute.[3]  Notably, of the 47 signatories to the CSA, only two are parties to this action: Plaintiff and Canada Holdings.[4]

Against this backdrop, the specific claims raised in the operative Amended and Supplemental Verified Complaint (the "Amended Complaint") comprise five counts.  Count I alleges the Millers breached their respective fiduciary duties in connection with the Inversion by securing unfair preferential terms for themselves at the expense of other stockholders, and "by taking [Amgine US and Amgine Canada's][5] intellectual property, resources and corporate opportunity, including [a patent to protect the use of Amgine US's technology for medical applications (the "Medical Patent")], and providing them to Seven Medical."[6]  Count II is brought against the Miller Entities and Jonathan, to the extent he did not directly owe fiduciary duties to Amgine US, for aiding and abetting the Millers' or Roy's breaches of fiduciary duties.[7]  Count III seeks a declaration that "Seven Medical's

---

[2] Amended and Supplemental Verified Compl. ("Am. Compl.") (D.I. 30) Ex. 6.

[3] Am. Compl. ¶¶ 18, 23.

[4] Am. Compl. Ex. 6 at Schedule A.

[5] Throughout the Amended Complaint, Plaintiff uses the defined term "Amgine" to refer to Amgine and Amgine Canada, collectively.  As discussed below, this combination has created confusion.  For clarity, anytime a quote from the Amended Complaint includes the term "Amgine," I have replaced the defined term with "Amgine US and Amgine Canada."

[6] Am. Compl. ¶¶ 171, 173–74.

[7] Am. Compl. ¶ 179.

patents and other intellectual property, including but not limited to the Medical Patent, which (i) relate to work performed by, or at the direction of, the Millers while engaged by [Amgine US and Amgine Canada], or (ii) were prepared using [Amgine US and Amgine Canada] resources or funding, are owned by Amgine US."[8] Count IV asserts claims against the Millers and their affiliated entities for unjust enrichment following their receipt of "misappropriated funds and other assets of [Amgine US and Amgine Canada] to the detriment of [Amgine US and Amgine Canada] without justification."[9] And finally, Count V seeks a declaration under 8 *Del. C.* § 205 ("Section 205") that Amgine US's entry into the CSA was void, that the CSA itself is void and that no party to this action may seek to enforce any of the terms of the CSA in any court.[10]

Defendants have moved to dismiss the Amended Complaint in its entirety under Court of Chancery Rules 9(b), 12(b)(1), 12(b)(3), 12(b)(6), 12(b)(7) and the *forum non conveniens* doctrine. According to Defendants, several of the claims are time-barred. Defendants also argue that the "Patent Claims" (Count III and portions of Counts I, II and IV) must be dismissed for *forum non conveniens*. As for the "Inversion Claims" (Count V, and portions of Counts I, II and IV), Defendants

---

[8] Am. Compl. ¶ 185.

[9] Am. Compl. ¶ 187.

[10] Am. Compl. ¶ 194.

contend they must be dismissed because they arise from the CSA and, under Section 1.6(b) of the CSA (the "Forum Selection Clause"), any action or proceeding arising out of or related to the CSA must be litigated in Ontario, Canada.[11] Dismissal of the Inversion Claims is also appropriate, say Defendants, both because Plaintiff has failed to name necessary parties and because the Court may not exercise personal jurisdiction over those absent parties. Alternatively, Defendants contend that the Inversion Claims fail for want of specific allegations of fraud and well-pled allegations that the Inversion-related transactions were defective. Finally, Defendants argue that Count V must be dismissed for failure to state a claim.

For reasons explained below, I am satisfied that Defendants' arguments regarding time-barred claims cannot be decided on the pleadings. I am also satisfied that Defendants have failed to demonstrate that litigating in Delaware would be an overwhelming hardship. Accordingly, dismissal of the Patent Claims under the doctrine of *forum non conveniens* is inappropriate. Likewise, the Inversion Claims are not subject to the CSA's Forum Selection Clause, so Plaintiff's selection of Delaware as the forum to litigate its claims must be respected. As for the breach of fiduciary duty claims, contrary to Defendants' argument, Plaintiff has well pled breach of fiduciary duty with respect to the Inversion as the claim is subject to notice pleading standards, not the heightened pleading standard required for claims of

---

[11] Am. Compl. Ex. 6, § 1.6(b).

4

fraud.  On the other hand, Plaintiff has failed to state a claim under Section 205.

Count V, therefore, must be dismissed.

## I.  BACKGROUND

I have drawn the facts from well-pled allegations in the Amended Complaint, documents incorporated by reference or integral to that pleading and documents properly subject to judicial notice.[12]

### A. Parties and Relevant Non-Parties

Roy resides in Toronto, Ontario.[13]  In 2012, he founded Amgine US and non-party, Amgine Canada, to develop and operate a software application as a cloud service to automate the processing of travel requests.[14]  Although Roy formed Amgine US and Amgine Canada as separate companies, he, and the employees reporting to him, frequently failed to respect their corporate separateness.[15]  As a result, the operations and finances of the entities were not clearly delineated.[16]

---

[12] DRE 201, 202 (setting forth Delaware's "judicial notice" standards); *Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 860 A.2d 312, 320 (Del. 2004) (noting that on a motion to dismiss, the Court may consider documents that are "incorporated by reference" or "integral" to the complaint).

[13] Am. Compl. Ex. A.

[14] Am. Compl. ¶ 45.  Plaintiff is a Delaware corporation and Amgine Canada is a "Canadian corporation."  Am. Compl. ¶¶ 34, 40.

[15] Am. Compl. ¶ 47.

[16] *Id.*

Roy served as director and CEO of Amgine US and Amgine Canada until he was removed from those positions by the stockholders of both companies in May 2019.[17]

Jonathan resides in Austin, Texas.[18] In 2012, Roy unilaterally appointed Jonathan as Chief Innovation Officer of Amgine Canada. Three years later, in 2015, Roy again unilaterally appointed Jonathan as an officer, this time as Chief Technology Officer of Amgine US and some of its affiliates, including Amgine Canada. Jonathan remained in that position until August 15, 2019.[19]

Defendant, Seven Medical, is a Delaware corporation founded by Roy in October 2014.[20] It is owned or controlled by the Millers and Roy's longtime business partner, non-party, James Valverde, Jr.[21] Substantially all of Seven Medical's assets are, or were, built from resources taken from Amgine US or Amgine Canada.[22]

---

[17] Am. Compl. ¶¶ 1, 35.

[18] Am. Compl. ¶ 36.

[19] *Id.*

[20] Am. Compl. ¶ 37.

[21] Am. Compl. ¶¶ 11, 37.

[22] Am. Compl. ¶ 37.

Defendant, US Holding LLC, is a Wyoming limited liability company controlled by the Millers through a family trust.[23] US Holding is the record owner of the Millers' equity interests in Plaintiff, consisting of common stock and a convertible debenture.[24]

Defendant, Canada Holdings, is a Canadian corporation controlled by the Millers through a family trust.[25] Canada Holdings is the record owner of the Millers' preferred equity in Amgine Canada.[26] Relevant here, the Millers own 67.8% of the new class of preferred stock in Amgine Canada that was created to facilitate the Inversion (the "CA Preferred").[27]

Non-party, James Valverde, Jr., served on Plaintiff's board and as its Chief Analytics Officer from August 2014 to April 2017.[28] From December 2014 through April 2017, he was Plaintiff's sole director.[29] Valverde is a close friend of the

---

[23] Am. Compl. ¶ 38.

[24] *Id.*

[25] Am. Compl. ¶ 39.

[26] *Id.*

[27] Am. Compl. ¶¶ 39, 137; Am. Compl. Ex. 6, at Schedule A. Canada Holdings, as holder of CA Preferred shares, is a party to the CSA.

[28] Am. Compl. ¶ 41.

[29] *Id.*

Millers and has worked with Roy at various businesses.[30] Undisclosed to the stockholders of Amgine US or Amgine Canada during the relevant period, Valverde was also a trustee for the Millers' family trust, which directly owns US Holding and Canada Holdings.[31]

## B. The Inversion Claims

According to Plaintiff, in the spring of 2016, Roy devised a plan to collapse Amgine Canada into Amgine US—i.e., the "Inversion."[32] Three interrelated steps occurred to effect the Inversion: "(1) Amgine Canada exchanged newly issued [CA Preferred] for its then-outstanding common stock; (2) Amgine Canada [] transferred substantially all of its assets, including its own common stock and its common stock in Amgine US, to Amgine US pursuant to a subscription agreement; and (3) Amgine US [] entered into the [CSA] with Amgine Canada and all of the CA Preferred holders."[33]

Plaintiff alleges the Millers breached their fiduciary duties as controlling stockholders and officers when they caused Amgine US to enter into the CSA because the CSA is structured unfairly to favor the holders of the CA Preferred in

---

[30] *Id.*

[31] Am. Compl. ¶ 42.

[32] Am. Compl. ¶ 91

[33] Am. Compl. ¶ 17.

several respects at the expense of Amgine US.[34]  Specifically, upon the liquidation of either Amgine US or Amgine Canada, the holders of the CA Preferred are to receive a $10 million liquidation preference.[35]  This preference, when exercised, will result in a $6.78 million payment to the Millers because they are the beneficial owners of 67.8% of the CA Preferred.[36]  The liquidation provision also includes a drag-along right that is triggered if Amgine US or Amgine Canada receives an acquisition offer that is approved by 66.67% of the CA Preferreds.[37]  In other words, if the holders of 66.67% of the CA Preferred deem a Liquidation Offer acceptable, then the remaining CA Preferreds must sell on those terms.  Because the Millers control more than 66.67% of the CA Preferred, they can unilaterally cause the sale of Amgine Canada—provided, of course, there is a willing buyer.

Amgine US alleges that, in an effort to "justify the Inversion to [Amgine US and Amgine Canada's] outside stockholders, the Millers hired Deloitte LLP to provide a calculation of the fair market value of Amgine Canada (the 'Deloitte

---

[34] Am. Compl. ¶¶ 167–170, 173–74.

[35] Am. Compl. ¶ 96.  I refer to the holders of CA Preferred as the "CA Preferreds."

[36] Am. Compl. ¶¶ 96, 137.

[37] Am. Compl. ¶ 137.  The Millers' control over Amgine Canada's future is further cemented by the fact that any amendment or modification to the CSA must be approved by at least 50% of the CA Preferred.  Am. Compl. ¶ 138.

Valuation').”[38]  According to Amgine US, the Millers knowingly provided false and misleading information to Deloitte, and then “took their fraudulent valuation and fraudulently induced [Amgine US] and Amgine Canada into purporting to enter into the Inversion and the [CSA].”[39]  As a result, Amgine US alleges that the subsequent stockholder approval was invalid because the stockholders were uninformed and their consent was fraudulently induced.[40]

Amgine US maintains that its acquisition of Amgine Canada, at this point, cannot be unwound.[41]  Accordingly, Amgine US has started the process of ratifying its acquisition under 8 *Del. C.* § 204.[42]  Related to this process, Amgine US seeks a determination under Section 205 that its entry into the CSA was void *ab initio*, presumably so the CSA and related agreements can be restructured on fair terms.[43]

---

[38] Am. Compl. ¶ 21.

[39] Am. Compl. ¶ 23.  Specifically, Amgine US alleges that, in an attempt to inflate the value of Amgine Canada, the Millers provided Deloitte false information about the commercial readiness of Amgine US's and Amgine Canada's technology and concealed the fact that Amgine US had already contributed $12.9 million USD towards development of the technology.  Am. Compl. ¶¶ 22, 107.

[40] Am. Compl. ¶¶ 99–114.

[41] Am. Compl. ¶ 5; Pl.'s Answering Br. in Opp'n to Defs.' Mot. to Dismiss (“AB”) (D.I. 43) at 10.

[42] AB at 10; Am. Compl. ¶ 32.

[43] Am. Compl. 54, ¶¶ 33, 192, 194.

## C. The Patent Claims

In separate claims, Amgine US alleges the Millers and Valverde misappropriated a corporate opportunity from Amgine US by abandoning the Medical Patent, a contested provisional patent filed to protect medical applications of Amgine US's core technology, and refiling it in July 2015 under their own names.[44] Subsequently, in June 2019, the Millers and Valverde were awarded the Medical Patent, which they assigned to Seven Medical on August 29, 2017.[45] Amgine US seeks a declaration that it is the rightful owner of the Medical Patent (Count III).[46] It also asserts that Defendants' conduct with respect to the Medical Patent is the product of fiduciary duty breaches (Count I),[47] and the aiding and abetting of such breaches (Count II),[48] and that the result of this wrongdoing has unjustly enriched the Millers and the Miller Entities (Count IV).[49]

---

[44] Am. Compl. ¶ 85.

[45] Am. Compl. ¶¶ 11, 88.

[46] Am. Compl. ¶¶ 183–85.

[47] Am. Compl. ¶¶ 171–72.

[48] Am. Compl. ¶ 181.

[49] Am. Compl. ¶ 187.

Amgine US also vaguely asserts that Roy presently holds patents belonging to Amgine US, which he refuses to assign to Amgine US.[50] The Amended Complaint, however, provides no details concerning these patents, the dates on which Amgine US's claims arose or any basis for Amgine US's entitlement to them.

**D. Procedural History**

This action marks the third lawsuit involving most of the parties involved here. On November 6, 2019, Jonathan and his sister, non-party Naomi Miller, sued Amgine US and a related entity in Texas for wages that allegedly went unpaid while Roy controlled the payroll (the "Texas Action").[51] On April 30, 2020, Amgine US filed counterclaims against Jonathan, in which it asserted claims for breach of fiduciary duties and unjust enrichment.[52]

Just over a month after Jonathan filed the Texas Action, on December 9, 2019, Roy sued Amgine US and certain related entities in Ontario, Canada for wages and benefits that Amgine US allegedly failed to pay Roy while Roy worked for Amgine US (the "Ontario Action").[53] Then, on July 8, 2020, Amgine US filed

---

[50] Am. Compl. ¶¶ 162–65.

[51] AB at 2; Defs.' Corrected Opening Br. in Supp. of Mot. to Dismiss Am. Compl. ("OB") (D.I. 40) Ex. C.

[52] OB Ex. C.

[53] AB at 2.

counterclaims against Roy, US Holding and Canada Holdings, alleging that Roy could not recover supposedly unpaid wages because he had already extracted more than what was owed him through self-dealing.[54] The alleged self-dealing related to the misappropriation of intellectual property referred to as "the Parser."[55]

Amgine US filed its initial complaint in this Court on June 30, 2020.[56] Defendants moved to dismiss that complaint on September 15, 2020, and Amgine US responded by filing the Amended Complaint on December 11, 2020.[57] Defendants moved to dismiss the now-operative Amended Complaint on December 28, 2020.[58]

## II. ANALYSIS

As noted, Defendants have moved to dismiss on several grounds. I first address the arguments related to the Patent Claims. I then turn to the Inversion Claims, and as a threshold matter, I address Defendants' argument that the Forum Selection Clause requires Plaintiff to bring the Inversion Claims in Ontario. Upon concluding that the Forum Selection Clause does not cover the claims asserted here,

---

[54] OB Ex. B.

[55] *Id.*

[56] D.I. 1.

[57] D.I. 14, 30.

[58] D.I. 35.

I address the remaining arguments and conclude, save Count V, that all other counts in the Amended Complaint survive dismissal.

## A. The Patent Claims Survive Dismissal

Defendants seek dismissal of the Patent Claims on two grounds. First, they argue that, under the doctrine of *forum non conveniens*, the Court must dismiss the Patent Claims because similar intellectual property disputes are pending in Texas and Canada.[59] And, second, they maintain the Patent Claims must be dismissed because they are time-barred under Ontario's two-year statute of limitations.[60] Neither ground is persuasive.

### 1. Forum Non Conveniens

For reasons explained below, in the absence of a qualifying "first-filed" action, Defendants' *forum non conveniens* argument rises or falls under its theory that application of the *Cryo-Maid* factors makes clear the Patent Claims should be litigated in Canada, not Delaware.[61] Under Chancery Rule 12(b)(3), this court may dismiss or stay an action upon concluding that Delaware is an inconvenient forum in which to litigate.[62] Specifically, "[t]he doctrine of *forum non conveniens*

---

[59] Defs.' Reply Br. in Supp. of Mot. to Dismiss Am. Compl. ("RB") (D.I. 46) at 3.

[60] RB at 2–3.

[61] OB at 23; RB at 32. *See generally, Gen. Foods Corp. v. Cryo-Maid, Inc.*, 198 A.2d 681 (Del. 1964).

[62] *Lefkowitz v. HWF Hldgs., LLC*, 2009 WL 3806299, at *3 (Del. Ch. Nov. 13, 2009)

14

empowers a court to decline to hear a case, despite having jurisdiction, where the plaintiff's choice of forum would vex, oppress, or harass the defendant through undue inconvenience, expense, or other hardship."[63]

In considering a motion to dismiss for *forum non conveniens* where the Delaware action is the only action filed,[64] or where the Delaware action is first-filed, this court applies *Cryo-Maid*.[65]  If litigation is commenced prior to the Delaware action "involving the same parties and the same issues" in a court "capable of doing prompt and complete justice," then this court applies the discretionary *McWane* standard which allows the court to defer more readily to the court in which related litigation was first filed.[66]  Thus, as a threshold matter, I must determine if the Patent Claims are pending elsewhere in a first-filed action.  They are not.

---

("Courts traditionally dismiss a matter under Rule 12(b)(3) when the contract underlying the dispute contains an explicit forum selection clause or when, applying the doctrine of *forum non conveniens*, Delaware is clearly not the appropriate forum for litigation.").

[63] *Vichi v. Koninklijke Philips Elecs. N.V.*, 2009 WL 4345724, at *12 (Del. Ch. Dec. 1, 2009) (citing to *Chrysler First Bus. Credit Corp. v. 1500 Locust Ltd. P'ship*, 669 A.2d 104, 106 (Del. 1995)).

[64] *Id.* at *12.

[65] *AG Res. Hldgs., LLC v. Terral*, 2021 WL 486831, at *2 (Del. Ch. Feb. 10, 2021).

[66] *McWane Cast Iron Pipe Corp. v. McDowell-Wellman Eng'g Co.*, 263 A.2d 281 (Del. 1970).

Neither of the Millers' lawsuits pending elsewhere will address the wrongdoing alleged in connection with the Patent Claims.[67] Seven Medical, a necessary party with respect to the majority of Patent Claims, is not a party in either the Texas or the Ontario Actions.[68] Moreover, the intellectual property disputes in Texas and Ontario involve different assets and different causes of action.[69] Both the Texas and Ontario Actions involve claims relating to the Parser, which have since been dropped from this action.[70] The Texas Action will address claims that Jonathan breached his employment agreement when he shared confidential information pertaining to Plaintiff's intellectual property.[71] The Ontario Action will address claims that Roy engaged in self-dealing related to the Parser and is therefore precluded from recovering unpaid wages.[72] On the other hand, Roy's alleged refusal to execute the assignments implicated in the Patent Claims did not occur until after the Texas and Ontario Actions were filed and are not, therefore, at issue in those

---

[67] AB at 55.

[68] OB Ex. A ¶¶ 2–6; OB Ex. C, at 1; AB at 55.

[69] OB Ex. B. Plaintiff "eliminated claims related to the Parser from this action in order to prevent any collision of rulings between this Court and the Ontario Action." AB at 56.

[70] RB at 33.

[71] AB at 55; OB Ex. C.

[72] AB at 55–56.

cases.[73] Given that neither of the two cases pending elsewhere will address the claims pending before this Court, no first-filed action triggers *McWane* deference.

Having concluded that the Patent Claims are not pending elsewhere, I analyze the *forum non conveniens* defense in accordance with *Cryo-Maid*. "Under our *Cryo-Maid* jurisprudence, a defendant seeking dismissal on *forum non conveniens* grounds must establish with particularity that it will be subject to overwhelming hardship and inconvenience if required to litigate in Delaware."[74] To assess the degree of hardship a defendant will face if required to litigate in Delaware, our courts apply the factors identified in *Cryo-Maid*.[75] As currently framed, those six factors are:

> (1) the relative ease of access to proof; (2) the availability of compulsory process for witnesses; (3) the possibility of the view of the premises; (4) whether the controversy is dependent upon the application of Delaware law which Delaware courts more properly should decide than those of another jurisdiction; (5) the pendency or nonpendency of a similar action or actions in another jurisdiction; and (6) all other practical problems that would make the trial of the case easy, expeditious and inexpensive. [76]

To succeed on a motion to stay or dismiss because of *forum non conveniens*, "[a] defendant must establish that one or more of the *Cryo-Maid* factors actually

---

[73] *See* Am. Compl. ¶ 172; AB at 55.

[74] *Vichi*, 2009 WL 4345724, at *12.

[75] *See Cryo-Maid*, 198 A.2d at 684 (identifying four factors).

[76] *Candlewood Timber Gp., LLC v. Pan Am. Energy, LLC*, 859 A.2d 989, 998 (Del. 2004) (expanding the *Cryo-Maid* factors); *Chase*, 2019 WL 6833958, at *3 (applying six factors).

causes [] significant hardship and inconvenience."[77] It does not matter whether, on balance, a majority of the factors favor defendant—"[t]he issue is whether any or all of the *Cryo-Maid* factors establish that defendant will suffer overwhelming hardship and inconvenience if forced to litigate in Delaware. Absent such a showing, [Amgine US's] choice of forum must be respected."[78]

**Relative Ease of Access to Proof** Based on the allegations in the Amended Complaint, it is clear that the Millers will be a focal point of discovery and trial proofs.[79] Roy is in Ontario.[80] Jonathan is in Texas.[81] Other sources of proof are US Holding (a Wyoming LLC), Canada Holdings (a Canadian corporation), Seven Medical (a Delaware corporation) and the present CEO of Amgine US, who is located in Ontario.[82] In other words, much if not all of the evidence resides outside of Delaware.

With that said, Roy and Jonathan have been served in this litigation and have not sought dismissal for want of personal jurisdiction over them. And the fact that

---

[77] *Chrysler*, 669 A.2d at 108.

[78] *Id.*

[79] AB at 57 (explaining the central role of Roy and Jonathan).

[80] Am. Compl. Ex. A.

[81] Am. Compl. ¶ 36.

[82] Am. Compl. ¶¶ 38–39; AB at 57.

documentary evidence may reside outside of Delaware, alone, is not a basis to find overwhelming hardship, particularly "in an age where air travel, express mail, electronic data transmissions and videotaped depositions are part of the normal course of business" for complex litigation in the United States.[83]  On balance, this factor is, at best, neutral.

**The Availability of Compulsory Process for Witnesses** Defendants have made no meaningful effort to demonstrate that necessary witnesses are beyond the reach of Delaware's compulsory process.  And they certainly have not attempted to argue that the application of this factor reveals that litigating in Delaware will cause overwhelming hardship.

**The Possibility of a View of the Premises** Neither party addressed this factor, and for good reason.  None of Plaintiff's claims suggest that a view of any premises will be necessary to present claims or defenses.

**Whether the Controversy Is Dependent upon the Application of Delaware Law**  The parties are centered in Delaware: Plaintiff is incorporated in Delaware,[84] and the Millers allegedly are fiduciaries of Plaintiff, a Delaware corporation.[85]  The harm is centered in Delaware: The Millers are alleged to have

---

[83] *In re Asbestos Litig.*, 929 A.2d 373, 384 (Del. Super. 2006) (citations omitted).

[84] Am. Compl. ¶ 34.

[85] Am. Compl. ¶¶ 35, 67–69.

intentionally misappropriated intellectual property from Plaintiff and assigned it to Seven Medical, an entity they control, which is also incorporated in Delaware.[86]  In so doing, the Millers allegedly usurped a corporate opportunity from Plaintiff.  While the Court need not declare definitively at this stage that Delaware law will apply to this claim, it does appear that Delaware law is the frontrunner among the possible contestants.  There is no overwhelming hardship to be found here.

**The Pendency or Nonpendency of a Similar Action or Actions in Another Jurisdiction**  As previously discussed, this action is not pending in another jurisdiction; the Texas and Ontario Actions involve different intellectual property and different claims among variously different parties.  While the actions may be similar, in the sense that all three of the pending actions involve allegations of misappropriation of intellectual property, it cannot be said on this record that forcing Defendants to defend the Patent Claims in Delaware will result in overwhelming hardship of a nature that would justify denying Plaintiff its choice of forum.

**All Other Practical Problems That Would Make the Trial of the Case Easy, Expeditious and Inexpensive**  While Defendants argue this factor weighs in favor of not litigating in Delaware, Plaintiff persuasively observes that Defendants'

---

[86] Am. Compl. ¶¶ 37, 78–85.

20

argument in this regard is light on specifics.[87]  While it is true that these parties have chosen to litigate on multiple fronts and that a consolidation of claims and counterclaims in one forum would undoubtedly be more efficient, multi-forum litigation is not uncommon.  And, the fact that the parties have opted to engage on multiple fronts does not, on its own, justify dismissal of the Delaware piece of the multi-forum puzzle, at least not on grounds of *forum non conveniens*.[88]

## 2. Statute of Limitations/Laches

Defendants argue that the Patent Claims are time-barred under the applicable Ontario statute of limitations.[89]  According to Defendants, Ontario law clearly applies to the Patent Claims given the Amended Complaint's acknowledgement that the Medical Patent and related corporate opportunities belonged to Amgine Canada.[90] Thus, say Defendants, under the "internal affairs doctrine," Ontario law—not Delaware law—governs the Patent Claims.  And, because the wrongful act underlying the Patent Claims (the misappropriation) occurred on August 29, 2017, and the initial complaint was not filed until June 30, 2020, the Patent Claims are

---

[87] AB at 57–58.

[88] *See Ryan v. Gifford*, 918 A.2d 341, 349–50 (Del. Ch. 2007) (observing, even in the context of *McWane*, that Delaware courts do not reflexively dismiss or stay actions in Delaware simply because the parties are engaged in litigation elsewhere).

[89] OB at 27, 40.

[90] OB at 39 and RB at 29; Am. Compl. ¶¶ 46–49.

time-barred by Ontario's two-year statute of limitations.[91]

Plaintiff counters that Defendants have misread the Amended Complaint; specifically, Plaintiff disputes that it has pled the Medical Patent and the related claims belong to Amgine Canada.[92]  Separately, Plaintiff argues that even if Ontario law did govern the Patent Claims, the United States Patent Office did not disclose the assignment of the Medical Patent until June 2019, which means the Patent Claims were brought within Ontario's two-year statute.[93]

"Because [Plaintiff's'] claims sound in equity, the limitations doctrine that applies is laches, which focuses on whether an unreasonable delay in asserting the claim has unfairly prejudiced the defendant.  This court frequently uses the analogous statutory limitations period as the presumptive limitations period for

---

[91] RB at 2.

[92] AB at 59–60.  Plaintiff points to its allegation that the Medical Patent, among other assets, was "Amgine's intellectual property, resource[], and corporate opportunity." Am. Compl. ¶ 171.  Plaintiff's definition of "Amgine," which includes both Amgine US and Amgine Canada, muddies the water here and in other aspects of the Amended Complaint.  Am. Compl. ¶ 1.  *See also* Am. Compl. ¶ 10 ("In 2015, after Amgine had funded the expensive task of developing, drafting, and defending the Medical Patent, [the Miller's and Valverde] caused Amgine's counsel to abandon the draft Medical Patent filing.").  Even so, giving all reasonable inferences to Plaintiff, as I must at this stage, I accept Plaintiff's characterization of its pleading for now.  *See Doe v. Cahill*, 884 A.2d 451, 458 (Del. 2005) ("Finally, in ruling on a motion to dismiss under Rule 12(b)(6), a trial court must draw all reasonable factual inferences in favor of the party opposing the motion.").

[93] AB at 60.

laches."[94] If a party files a claim after the analogous statute of limitations has run, the claim is likely time-barred "except in the 'rare' and 'unusual' circumstance that a recognized tolling doctrine excuses the late filing."[95]

The factual record is not developed enough at this nascent stage of the litigation to make a dispositive determination regarding the timeliness of the Patent Claims. This should come as no surprise given that "the standard of review under Rule 12(b)(6) is only of reasonable conceivability based on the complaint, [and] affirmative defenses, such as laches, are not ordinarily well-suited for treatment on such a motion, even though the Court may reach a different answer with a more developed factual record."[96]

After the record is developed further, if the evidence reveals that Amgine US possessed the intellectual property that is the object of the Patent Claims, then Defendants' theory that the Patent Claims are subject to Ontario's statute of limitations would likely fail, and Delaware's three-year statute of limitations would

---

[94] *de Adler v. Upper New York Inv. Co. LLC*, 2013 WL 5874645, at *12 (Del. Ch. Oct. 31, 2013).

[95] *In re Sirius XM S'holder Litig.*, 2013 WL 5411268, at *4 (Del. Ch. Sept. 27, 2013) (citations omitted).

[96] *de Adler*, 2013 WL 5874645, at *12 (cleaned up) (quoting *Reid v. Spazio*, 970 A.2d 176, 182–83 (Del. 2009)); *see also Khanna v. McMinn*, 2006 WL 1388744, at *30 (Del. Ch. May 9, 2006) (same).

apply.[97]  Even if Ontario law governs, there may be factual or equitable grounds to toll the limitations period.  On the other hand, the evidence may dispositively reveal that a two-year statute of limitations applies and that Plaintiff failed to bring its claims in Delaware within the statutory window.  If so, Defendants may pursue judgment as a matter of law on that ground under Chancery Rule 56.  The point, for now, is that further development of the factual record is required before the Court can adjudicate the laches defense.

* * * * *

The motion to dismiss the Patent Claims under Chancery Rule 12(b)(3) is denied; those claims will be litigated in Delaware.  The motion to dismiss the Patent Claims under Chancery Rule 12(b)(6) as untimely is also denied; Defendants may renew their laches defense, if appropriate, on summary judgment.

## B. The Inversion Claims Survive Dismissal

Defendants move to dismiss the Inversion Claims on four grounds: (1) dismissal is required under the CSA's Forum Selection Clause; (2) dismissal is required under Chancery Rule 19(b) because Plaintiff has failed to join necessary parties—the CA Preferreds not named in this action; (3) the Inversion Claims are

---

[97] 10 *Del. C.* § 8106(a) (codifying a three-year limitations period for an "action to recover damages for the detention of personal chattels" or for an "action to recover damages caused by an injury unaccompanied by force.").

time-barred under both Delaware and Ontario law; and (4) Plaintiff has failed to plead fraud regarding the Inversion with the requisite specificity under Rule 9(b). I address each ground in turn.

### 1. The Forum Selection Clause

"The courts of Delaware defer to forum selection clauses and routinely give effect to the terms of private agreements to resolve disputes in a designated judicial forum out of respect for the parties' contractual designation."[98] Accordingly, "when the contract underlying the dispute contains an explicit forum selection clause," this court will dismiss a Delaware complaint under Chancery Rule 12(b)(3) if the clause requires the action to be brought elsewhere.[99] Here, the contract underlying this dispute, the CSA, contains an explicit forum selection clause that requires actions "arising out of or relating to" the CSA to be brought in Ontario, Canada.[100] Amgine US argues the clause is unenforceable as a matter of Delaware law and, even if it is

---

[98] *Ashall Homes, Ltd. v. ROK Entm't Gp. Inc.*, 992 A.2d 1239, 1245 (Del. Ch. 2010) (internal quotations omitted).

[99] *Baker v. Impact Hldg., Inc.*, 2010 WL 1931032, at *2 (Del. Ch. May 13, 2010).

[100] Am. Compl. Ex. 6, §1.6(b) ("Subject to the dispute resolution provisions of this Agreement, each of the Parties irrevocably attorns and submits to the exclusive jurisdiction of the courts of Ontario in any action or proceeding arising out of or relating to this Agreement. Each of the Parties waives objection to the venue of any action or proceeding in such court or any argument that such court provides an inconvenient forum.").

enforceable, the clause does not apply to the claims it has asserted here.[101] I address both arguments in turn.

### a. The Forum Selection Clause Is Valid and Enforceable

When a contract contains a forum selection clause, this court will interpret the forum selection clause in accordance with the law chosen to govern the contract.[102] "Here, the agreement clearly chose [Canadian] law to govern the parties' relationship" under the CSA.[103] In their opening brief, Defendants cite one Canadian case to confirm that Canadian courts, like Delaware courts, generally enforce forum selection and choice-of-law clauses.[104] Amgine US does not cite any contrary authority. Given that there appears to be no conflict of law, "the analysis will proceed exclusively under Delaware law."[105]

---

[101] I note that Amgine US does not argue the Forum Selection Clause is not actually an exclusive forum selection clause. *See In re Bay Hills Emerging P'rs I LP*, 2018 WL 3217650, at *8 (Del. Ch. July 23, 2018) (explaining the distinction between a "permissive consent to jurisdiction clause" and a "mandatory forum selection clause"). Accordingly, I do not take up that issue here.

[102] *See Germaninvestments AG v. Allomet Corp.*, 225 A.3d 316, 331 (Del. 2020) ("When a contract contains a forum selection clause, this court will interpret the forum selection clause in accordance with the law chosen to govern the contract.") (internal quotations omitted).

[103] *Ashall*, 992 A.2d at 1245–46.

[104] OB at 20–21 (citing *Aldo Gp. Inc. v. Moneris Sols. Corp.*, [2013] 118 O.R. (3d) 81, ¶ 44, 2013 ONCA 725 (Can. Ont. C.A.)).

[105] *Ashall*, 992 A.2d at 1246.

According to Amgine US, because the transactions memorialized in the CSA are void for failure of proper authorization, the Forum Selection Clause within the CSA is also void and, therefore, unenforceable.[106] That is not a correct statement of Delaware law. Instead, our law is clear that a party cannot escape a valid forum selection clause "by arguing that the underlying contract was fraudulently induced or invalid for some reason unrelated to the forum selection . . . clause itself. Instead, the party must show that the forum selection clause itself is invalid."[107] Amgine US has not advanced any argument that the Forum Selection Clause itself is invalid, and so I proceed under the presumption that the clause is valid as a matter of law.

### b. The Forum Selection Clause Does Not Govern the Inversion Claims

Amgine US argues its claims do not "aris[e] out of or relat[e] to" the CSA because the claims sound in breach of fiduciary duty, not breach of contract.[108] For support, Amgine US cites *OTK Assocs., LLC v. Friedman*, where the court observed, "[i]t has not traditionally been thought that a contractual forum selection provision in the transaction agreement governed the stockholder plaintiffs' claims for breach of fiduciary duty and aiding and abetting."[109] In their papers, Defendants make no

---

[106] Am. Compl. ¶ 4.

[107] *Mack v. Rev Worldwide, Inc.*, 2020 WL 7774604, at *12 (Del. Ch. Dec. 30, 2020).

[108] AB at 36–37.

[109] *OTK Assocs., LLC v. Friedman*, 85 A.3d 696, 721 (Del. Ch. 2014) (emphasis added).

attempt to distinguish *OTK*. In their reply brief, Defendants appear all but to concede that the Forum Selection Clause does not govern Counts I and II of the Inversion Claims and only halfheartedly attempt to explain why it governs the unjust enrichment claim pled in Count IV.[110]

In *OTK*, the court held that a forum selection clause within an exchange agreement would not extend to claims that the defendants breached fiduciary duties in connection with the exchange.[111] In doing so, the court made clear that the fiduciary duties at issue did not arise from the exchange agreement.[112] The same is true here. The fiduciary duties the Millers allegedly breached were not created by the CSA and would exist in the absence of the CSA. Accordingly, the Forum Selection Clause does not extend to Counts I and II, as both allege breaches of fiduciary duty related to the Inversion.[113]

As for Count IV, I am satisfied the Forum Selection Clause does not reach that claim either. Count IV asserts a claim for unjust enrichment against the Millers

---

[110] RB at 11–12 ("Third, even if the breach of fiduciary duty (Count I) and aiding and abetting claims (Count II) are 'internal affairs' claims subject to Delaware's statute of limitations, the unjust enrichment claim (Count IV) is not. Unjust enrichment is a quasi-contract claim subject to the Choice of Law and Forum Selection Clauses of the [CSA].").

[111] *OTK Assocs., LLC*, 85 A.3d at 721.

[112] *Id.*

[113] *Id.*

and the Miller Entities based on their alleged receipt of misappropriated funds and assets.[114]  According to Defendants, unlike Counts I and II, which are internal affairs claims, the unjust enrichment claim is a *quasi*-contract claim and is therefore subject to the Forum Selection Clause.[115]  Here again, Defendants seek to extend the contractually selected forum beyond the reach of its terms.

Defendants are correct that "[a]n unjust enrichment claim is a quasi-contractual claim, but it is a claim that proceeds under the theory that no contract exists."[116]  A claim that rests on the premise "that no contract exists," by definition, does not "aris[e] out of or relat[e] to" a contract.[117]  Because the unjust enrichment claim is derived from common law[118] and does not arise out of or relate to the CSA, it does not fall within the scope of the Forum Selection Clause.[119]

---

[114] Am. Compl. ¶¶ 187–89.

[115] RB at 11–12.

[116] *JCM Innovation Corp. v. FL Acq. Hldgs., Inc.*, 2016 WL 5793192, at *7 (Del. Super. Sept. 30, 2016).

[117] Am. Compl. Ex. 6, §1.6(b).

[118] *In re Verizon Ins. Coverage Appeals*, 222 A.3d 566, 577 (Del. 2019), *reh'g denied* (Nov. 18, 2019) (stating "unjust enrichment and alter ego claims are common law claims").

[119] *EnVen Energy Corp. v. Dunwoody*, 2020 WL 2770609, at *3 (Del. Ch. May 28, 2020) ("Because the claims asserted [] in this action derive from common law and do not directly pertain to the rights set forth in the Employment Agreement, they do not fall within the scope of the forum selection provision.").

## 2. The Absent CA Preferreds Are Not Indispensable Parties

Rule 19 dictates that an absent party should be joined if, without that party, (1) "complete relief cannot be accorded among those already parties"; (2) the absent party's ability to protect its interest in the action will be impaired or impeded; or (3) "any of the persons already parties [will remain] subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations . . . ."[120] If Plaintiff had pled a basis to rescind or reform the CSA, then I would agree that the absent CA Preferreds likely would be indispensable.[121] But the Amended Complaint pleads no basis for either of those equitable remedies here.

The gravamen of Plaintiff's Inversion Claims is that the Millers' breached the fiduciary duties they owed to Amgine US by causing it to agree to the CSA.[122] If Plaintiff is successful on that claim, the Court can tailor remedies to address the harm Plaintiff suffered without affecting the rights of the innocent absent

---

[120] *Perry v. Neupert*, 2017 WL 6033498, at *11 (Del. Ch. Dec. 6, 2017).

[121] *See Perry*, 2017 WL 6033498, at *12; *Germaninvestments AG v. Allomet Corp.*, 2020 WL 6870459, at *8 (Del. Ch. Nov. 20, 2020) ("Delaware decisions recognize that when litigation places at issue the validity or enforceability of property rights, such as a party's rights under an agreement, then the holders of the property rights have an interest in the subject matter of the action such that they should be joined as parties. Unless it is obvious that one not joined has no interest whatever in the subject matter of the suit, all parties to a contract under dispute are necessary.") (internal quotations omitted).

[122] Am. Compl. ¶¶ 173–74.

CA Preferreds.[123]  Indeed, Plaintiff has asked for remedies that, if awarded, would not implicate, let alone impair, the validity or enforceability of the rights of the absent CA Preferreds.  These remedies, all directed to the named Defendants, include, but are not limited to, the imposition of a constructive trust, monetary damages and disgorgement.[124]  To be clear, for reasons discussed with respect to Plaintiff's Section 205 claim (below), as to the Inversion Claims, Plaintiff's remedies may not include an injunction against the absent CA Preferreds from seeking to enforce the CSA, a declaration that the CSA is void, rescission,[125] or reformation of the CSA.[126]  If Amgine US fiduciaries caused Amgine US to enter

---

[123] *Arnold v. Soc'y for Sav. Bancorp, Inc.*, 1995 WL 376919, at *4 (Del. Ch. June 15, 1995) (holding that a "court of equity should protect the rights of an innocent acquiror, just as commercial law protects the rights of a good faith purchaser.").  Am. Compl. ¶¶ 5, Prayer for Relief J, K, M.

[124] Am. Compl. at 37.

[125] An injunction preventing the absent CA Preferreds from enforcing the CSA would have the same effect as a declaration that the CSA is void or is rescinded.  Rescission "is extreme relief, which cannot be accomplished absent all parties to the agreement." *S'holder Rep. Servs. LLC v. RSI Holdco, LLC*, 2019 WL 2207452, at *4 (Del. Ch. May 22, 2019). Further, it is well settled law in this state "that if a plaintiff chooses the remedy of rescission, there must be a restoration of the *status quo ante*, not only of the plaintiff but of the defendant as well, and if under the facts of the particular case 'a just and equitable restoration of the substantial status quo ante' cannot be accomplished, rescission will be denied." *Craft v. Bariglio*, 1984 WL 8207, at *12 (Del. Ch. Mar. 1, 1984) (quoting *Hegarty v. Am. Commonwealths Power Corp.*, 163 A. 616, 619 (Del. Ch. 1932)).  Plaintiff concedes that "Amgine US's acquisition of Amgine Canada cannot be unwound as a practical matter," and if the Inversion cannot be unwound, recission must be denied.  *See* AB at 10.

[126] "The remedy of reformation typically is used to conform a document to the parties' intent in cases of mutual mistake or fraud. It also can be used to remedy a breach of fiduciary duty; in which case the court has broad authority to fashion an appropriate

31

into a contract with disinterested third-parties that is unfavorable to the company and its stockholders but favorable to the fiduciaries, or caused the company to contract with arms-length third-parties without obtaining proper approvals, then Amgine US may seek remedies that directly affect the fiduciary wrongdoers to address the harm caused. Amgine US cannot, however, seek to undo or reform the contract without naming all parties to the contract as party defendants.[127]

---

remedy." *Zimmerman v. Crothall*, 62 A.3d 676, 713 (Del. Ch. 2013). There are only a handful of cases that apply reformation when mutual mistake, unilateral mistake or fraud is not present. In *In re Loral Space*, for instance, this court reformed an agreement despite the absence of the typical reformation requirements. In doing so, the court relied on the fact that "[o]ur Supreme Court has emphasized the broad remedial power of this court to address breaches of the duty of loyalty." *In re Loral Space & Commc'ns Inc.*, 2008 WL 4293781, at *33 (Del. Ch. Sep. 19, 2008). Given the circumstances of this case, however, reformation of the CSA clearly is not an appropriate equitable remedy. In *In re Loral*, the court concluded that a financing entered into by a company and its largest stockholder ("MHR"), a party to the action, was unfair to the company and its other stockholders. As a remedy, the court reformed the transaction by converting MHR's preferred stock into non-voting common stock at a price set by the court. Reformation is not implicated in this case, however, because the Inversion did not change the Millers' overall equity ownership, unlike MHR in *Loral*. *See Interactive Corp. v. Vivendi Universal, S.A.*, 2004 WL 1572932, at *15 (Del. Ch. July 6, 2004) (explaining that reformation "must be applied narrowly so as to ensure contracting to parties that in only limited circumstances will the court look beyond the four corners of a negotiated contract ... especially where the [contract] is an integrated document"). And, importantly, the reformation in *Loral* affected only the rights of parties who had appeared in the litigation.

[127] *See generally Strassburger v. Earley*, 752 A.2d 557, 578 (Del. Ch. 2000) (holding that a transaction could not be rescinded because a party to the transaction was not a party the lawsuit); 12A C.J.S. *Cancellation of Inst.* § 115 ("All parties to a contract or agreement are necessary parties to an action to rescind it."); *Perry*, 2017 WL 6033498, at *12 (holding that "when litigation places at issue the validity or enforceability of property rights, such as a party's rights under an agreement, then the holders of the property rights have an interest in the subject matter of the action such that they should be joined as parties.").

I recognize that now is not the time to decide the appropriate remedy for any proven breach of fiduciary duty, and I am not foreclosing the possibility that if Plaintiff is successful, the proper remedy might include an injunction that would prevent *the Defendants before the Court* from exercising some or all of their rights under the CSA.[128] Rather, I am clarifying that Plaintiff's potential remedies are limited to remedies that will not harm the innocent absent CA Preferreds or their rights under the CSA.[129] Because complete relief can be afforded to Plaintiff, even in the absence of most of the CA Preferreds, and the rights of the absent

---

[128] *See Brinckerhoff v. Enbridge Energy Co., Inc*., 159 A.3d 242, 262 (Del. 2017) (holding that, at the motion to dismiss stage, a plaintiff "will not be limited to a specific equitable remedy. Whether an equitable remedy should be ordered will depend on the [this Court's] assessment of the equities, which include the practicality of an equitable remedy given the passage of time, and the ability to order equitable relief tailored to the harm caused by [the breach.]"); *FrontFour Cap. Gp. LLC v. Taube*, 2019 WL 1313408, at *2 (Del. Ch. Mar. 11, 2019) (stating that "an injunction may not issue if it would 'strip an innocent third party of its contractual rights' under a merger agreement, unless the party seeking the injunction proves that the third party aided and abetted a breach of fiduciary duty by the target directors.").

[129] *See, id.*; *In re RJR Nabisco, Inc. S'holders Litig.*, 1989 WL 7036, at *12 (Del. Ch. Jan. 31, 1989) (stating that the court "must be alert to the legitimate interests of the public or innocent third parties whose . . . legitimate interests might be affected by the issuance of the remedy."); *Andresen v. Bucalo*, 1984 WL 8205, at *5 (Del. Ch. Mar.14, 1984) ("The most difficult part of this case is for me to find a remedy which will protect the innocent in this fiasco . . . This Court, fortunately, has broad discretion to tailor remedies to suit the situation as it exists . . . The true situation here is that unless I intervene, the corporation will be manipulated for the sole benefit of [Defendants] with little concern for the rights of the other stockholders. I will, therefore, insist that the final remedy include provisions which will protect the other stockholders.) (citing to *Guarantee Bank v. Magness Constr. Co*., 462 A.2d 405 (Del. 1983)).

33

CA Preferreds will not be impaired or impeded by any judgment of this Court, I am satisfied there is no basis to dismiss for failure to join indispensable parties.[130]

### 3. The Court Cannot Declare the Inversion Claims Are Time-Barred On the Pleadings

For reasons explained above, the Inversion Claims likely arise under Delaware law, and therefore are likely subject to Delaware's three-year statute of

---

[130] In *Germaninvestments AG*, the court granted a motion to dismiss under Chancery Rule 19 upon concluding that it would be improper to move forward without the absent parties for four reasons, none of which are present here. *Germaninvestments AG*, 2020 WL 6870459, at *13–14. *First*, the court determined that proceeding without the absent parties would be prejudicial to parties both absent and present because "any judgment determining that the transfers were effective or ineffective … would represent a judicial determination that [the losing parties] do not have property rights." *Id.* at 13 (quoting Kennett v. Carlyle Johnson Mach. Co., 2002 WL 1358755, at *3 (Del. Ch. June 17, 2002)). There is no risk that a declaration issued in this case might be binding upon the absent CA Preferreds as the Court will not be declaring that the CSA is void or voidable. *Second*, the court found that the "prejudice to the necessary nonparties cannot be lessened or avoided." *Id.* at 13. Again, not so here as the Court can tailor remedies, as appropriate, to affect only the Defendants before the Court. *Third*, the court determined that "judgment rendered without joinder of [the absent parties] would be inadequate because it would encourage [subsequent] litigation to proceed in piecemeal fashion." *Id.* Here again, there is no risk of piecemeal litigation because there are no claims of wrongdoing (asserted or unasserted) to be brought against the absent CA Preferreds. *Fourth*, the court concluded that the *Germaninvestments* plaintiffs had "an adequate and available forum in Austria [in which to bring claims against all affected parties], which this Court and the Supreme Court have recognized has a material interest in this dispute. Indeed, Plaintiffs are presently pursuing a related action in Austria." *Id.* at 14. While there may or may not be an adequate and available forum elsewhere to assert the Inversion Claims, as just stated, there are no such claims to bring against the absent CA Preferreds and no need, therefore, for a forum where such claims could be brought.

limitations for breach of fiduciary duty claims.[131] Even if a shorter limitations period applied, as with the Patent Claims, I have determined, at this stage in the litigation, that the factual record is not developed enough to determine if the Inversion Claims are time-barred.

Dismissal would be appropriate only if it appears "with reasonable certainty that, under any set of facts that could be proven to support the claims asserted, the plaintiff would not be entitled to relief."[132] At this stage, I am satisfied there is a reasonably conceivable basis for tolling the statute of limitations with respect to the Inversion Claims. To be sure, "[e]ven the most persuasive allegations of tolling can only delay the limitations period until the party asserting the claim was on inquiry notice."[133] But, in this case, multiple factual disputes need to be settled before the point of inquiry notice can be established—including determining whether Roy was controlling the flow of information such that Plaintiff's agents could not have been aware of Defendants' allegedly wrongful acts,[134] and whether the disclosures made

---

[131] 10 *Del. C.* § 8106(a); *Halpern v. Barran*, 313 A.2d 139, 141 (Del. Ch. 1973) (noting that "[i]t is by now firmly established that the three-year statute of limitations" applies to claims of breach of fiduciary duty in Delaware).

[132] *Feldman v. Cutaia*, 951 A.2d 727, 731 (Del. 2008) (quoting *VLIW Tech., LLC v. Hewlett–Packard Co.*, 840 A.2d 606, 610 (Del. 2003)).

[133] *de Adler*, 2013 WL 5874645, at *15.

[134] AB at 50.

regarding the Inversion were sufficient to give rise to inquiry notice.[135] Those determinations may well be susceptible to summary adjudication under Chancery Rule 56, but they are not suitable for judgment on the pleadings under Chancery Rule 12.

### 4. The Inversion Claims Are Adequately Plead

Defendants argue the Inversion Claims as pled in Counts I, II and IV fail to state a claim because the allegations are fraud-based and fail to satisfy Chancery Rule 9(b)'s heightened pleading requirements. I disagree.

In Count I, Plaintiff alleges the Millers were controlling stockholders and thus fiduciaries of Amgine US.[136] Defendants do not contest the sufficiency of these

---

[135] OB at 37–38; AB at 50; *see Bush v. Hillman Land Co.*, 2 A.2d 133, 137 (Del. Ch. 1938) ("[W]hat constitutes laches is . . . so dependent for its demonstration on the facts . . . that the court should be quite clearly of the opinion that it exists before saying so . . . and it is in the discretion of the court to defer its decision upon that question until the stage of the case has been reached when it can be passed upon in the light of fuller and more illuminating information than is now available."); *Wal-Mart Stores, Inc.*, 860 A.2d at 320 (holding that whether plaintiff was on inquiry notice at a given date, to establish the tolling of the statute of limitations, was an intensely factual question not appropriate for disposition at the motion to dismiss stage); *Stoppel v. State, Dep't of Health & Soc. Servs.*, 2011 WL 3558120, at *4 n.13 (Del. Super. Ct. Aug. 9, 2011) ("Because the Amended Complaint does not on its face exclude the possibility that Stoppel's claims are timely under the Whistleblowers' Act, dismissal on statute of limitations grounds would not be appropriate. From the limited account of events currently provided to the Court, it appears that the determination of when the limitations period commenced could be a fact-intensive inquiry.").

[136] Am. Compl. ¶¶ 1, 24, 26, 35, 36, 69, 89, 141, 169.

allegations.[137]  And, while Defendants are correct that Plaintiff alleges the Millers breached their fiduciary duties by misleading stockholders, the essence of the Inversion Claims is a fiduciary duty breach, not fraud.[138]  As such, Plaintiff need only plead sufficient facts to put Defendants on notice of the claim.[139]

The rationale for the lower pleading bar is pellucid.  It is right to require a plaintiff to provide an arms-length third-party a particularized basis upon which to defend a claim that he has committed fraud; a fiduciary, on the other hand, occupies a special relationship with the beneficiary of his heightened duties and is held to a "tougher" standard in defending his conduct than the third-party acting at arms-

---

[137] OB at 51.

[138] AB at 17 (explaining how the allegations of deceit animate the claim for breach of fiduciary duties).

[139] *See, e.g.*, *Seiden v. Kaneko*, 2015 WL 7289338, at *2, 10–11 (Del. Ch. Nov. 3, 2015) (noting that a breach of fiduciary duty claim, predicated on allegedly fraudulent activity, "need only meet Delaware's rather forgiving notice pleading standard"); *In re Am. Int'l Gp.*, 965 A.2d at 776 (applying the "plaintiff-friendly" Rule 12(b)(6) standard to deny dismissal of breach of fiduciary duty claims alleging defendants committed "pervasive, diverse, and substantial financial fraud"); *In re Fruehauf Trailer Corp.*, 250 B.R. 168, 197 (D. Del. 2000) ("Although there is a dearth of case law, the Rule 9(b) heightened pleading requirement generally does not apply to the state law claims of breach of fiduciary duty, negligent misrepresentation, gross negligence, mismanagement, unjust enrichment, aiding and abetting breach of fiduciary duty, and breach of contract."); *Buckley v. O'Hanlon*, 2007 WL 956947, at *5 (D. Del. Mar. 28, 2007) ("Neither was particularized pleading required when the plaintiff's complaint included such statements as 'knew or should have known the financial statements . . . misrepresented to System One the Division's financial condition.'") (internal citation omitted).

length.[140]  As the Amended Complaint asserts breaches of fiduciary duty, not fraud, the pleading is measured by Chancery Rule 8, not Chancery Rule 9(b).

The two authorities Defendants cite in urging the Court to apply Rule 9(b) are readily distinguishable.  In *York Lingings v. Roach*, the court concluded that one of the plaintiff's breach of fiduciary duty claims was actually "an insufficiently pleaded claim of fraud."[141]  For reasons explained above, Plaintiff has stated breach of fiduciary duty claims that, in part, rest on allegations of misrepresentations.  These claims are properly measured under Chancery Rule 8.[142]  And, in *Lewis v. Ward*, the court addressed the unique circumstance where a stockholder plaintiff alleged "that an arm's-length merger of two public companies was not in fact consummated for the reasons contained in the merger proxy materials, but instead merely as a device to get rid of the plaintiff's derivative claims."[143]  The burden to plead particularized facts the court required plaintiffs to meet in that circumstance was imposed because plaintiff was seeking to invoke the fraud exception to *Lewis v. Anderson*, which

---

[140] *Metro Commc'n Corp. BVI v. Advanced Mobilecomm Techs. Inc.*, 854 A.2d 121, 156 (Del. Ch. 2004).

[141] *York Lingings v. Roach*, 1999 WL 608850, at *2 (Del. Ch. July 28, 1999).

[142] *Seiden*, 2015 WL 7289338, at *2, 10–11.

[143] *Lewis v. Ward*, 2003 WL 22461894, at *4 (Del. Ch. Oct. 29, 2003), *aff'd* 852 A.2d 896, 905 (Del. 2004).

implicates both Chancery Rules 9(b) and 23.1.[144]  No derivative claim has been pled here.  Accordingly, Chancery Rules 8 and 12(b)(6) set the correct standard.

### C. Plaintiff Has Failed to State a Claim Under Section 205

In Count V, Plaintiff seeks declarations that Amgine US's entry into the CSA was void, that the CSA is void and that no party to this action may seek to enforce any of the terms of the CSA in any court of law.[145]  In pursuing these declarations, Plaintiff breezily strolls past the actual terms of Section 205, which reveal the statute is not intended to act as an eraser in the hands of the judge to extirpate allegedly void or voidable corporate acts.[146]

Section 205 "fundamentally concerns a company having taken an act with the intent and belief that it is valid and later petitioning the Court to correct a technical defect and thereby remedy incidental harm."[147]  With this in mind, this court has emphasized that "Section 205 was intended to be a remedial statute designed, in

---

[144] When our Supreme Court affirmed the trial court's decision in *Lewis v. Ward*, it explained that "the particularized pleading requirement of Rule 9(b) must be satisfied by a derivative complaint that seeks to invoke the fraud exception in *Lewis v. Anderson*. Accordingly, the Court of Chancery correctly concluded that the plaintiff was required to plead 'particularized facts invoking the fraud exception to *Lewis v. Anderson* in order to avoid dismissal.'" *Lewis v. Ward*, 852 A.2d 896, 905 (Del. 2004).

[145] Am. Compl. ¶ 194.

[146] *See In re Genelux Corp.*, 126 A.3d 644, 668–69 (Del. Ch. 2015).

[147] *Id* at 669.

conjunction with Section 204, to cure otherwise incurable defective corporate acts, not a statute to be used to launch . . . plenary-type claims based on alleged breaches of fiduciary duty or common law fraud."[148]  But that is precisely how Plaintiff would have the Court put Section 205 to work here.  As stated, under the guise of Section 205, Plaintiff asks the Court to declare that the CSA is invalid because of a void corporate act, not to declare what "would have resulted if the defective corporate act had been valid when approved or effectuated."[149]  That is not a proper invocation of the statute and Plaintiff's claim to the contrary must be dismissed.[150]

## III.   CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss must be DENIED as to Counts I, II, III and IV and GRANTED as to Count V.

**IT IS SO ORDERED.**

---

[148] *Id.* at 668.

[149] 8 *Del. C.* § 205(b)(3).

[150] *Genelux*, 126 A.3d at 668 ("Section 205 was intended to be a remedial statute designed, in conjunction with Section 204, to ***cure otherwise incurable defective corporate acts***.") (emphasis added).